## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ZACHARY ROBERT DORLEY,         )
                                     )
        Plaintiff,               )
                                     )    Civil Action No. 2:15-cv-00214
v.                                    )
                                   )    Judge Mark R. Hornak
SOUTH FAYETTE TOWNSHIP SCHOOL  )
DISTRICT, et al,                  )
                                   )
        Defendants.          )

## OPINION

**Mark R. Hornak, United States District Judge**

This case arises out of injuries sustained at a local high school football training camp in 2009. The Plaintiff, then an incoming high school freshman,[1] participated in a blocking drill with an upperclassman and sustained injuries because of what he alleges was an unconstitutionally dangerous drill and the upperclassman's excessively aggressive and tortious conduct during and after that drill.

Using 42 U.S.C. § 1983, he has sued the South Fayette School District and at least some of its football coaches, alleging federal (and state) constitutional claims. He has also sued the involved upperclassman and his parents for several state law torts. After removing the case to this Court from state court, all Defendants moved to dismiss the Complaint for failure to state a claim. For the reasons that follow, Plaintiff's federal claims will be dismissed in their entirety, but with leave to amend certain of them. Some of the state law claims will also be dismissed. Should Plaintiff decline to amend his Complaint on the federal claims or they otherwise subsequently fail,

---

[1] Plaintiff filed suit after attaining the age of majority.

the remaining state law claims will be remanded to the Court of Common Pleas of Allegheny County for disposition. 28 U.S.C. § 1367(c).

## I. BACKGROUND

The events underlying this case occurred during a high school football training camp conducted by the South Fayette High School football team in May, 2009, for the students playing on the team that upcoming fall. ECF No. 1-1, at ¶ 14.[2] Zachary Robert Dorley ("Plaintiff" or "Mr. Dorley") was a 140-pound incoming freshman at the time. *Id.* at ¶¶ 13–14, 20. The Complaint alleges that the South Fayette School District, acting via Defendant coaches Rossi, Sweeney, and Yost (collectively with the School District, "School District Defendants"), organized a one-on-one blocking drill which "was not supposed to be done at full speed, and was described in advance by defendants . . . as 'non-contact.'" *Id.* at ¶¶ 15–16. Players performed the drill without helmets or other pads. *Id.* at ¶ 22. Mr. Dorley participated in the drill against Steven McElhinny ("Mr. McElhinny" or "Student Defendant"), a student and football player then in the eleventh grade, who allegedly then weighed approximately 240 pounds. *Id.* at ¶¶ 12, 20, 22. The Complaint alleges that Mr. McElhinny performed the drill at full speed and drove Mr. Dorley back farther than the prescribed distance (despite Mr. Dorley's yells for him to stop), ultimately giving "one final violent shove" which threw Mr. Dorley through the air and caused his arm to break. *Id.* at ¶¶ 23–24. Mr. Dorley claims he has had nine (9) surgical procedures on his arm, in addition to other treatment, and that he has suffered both physically and emotionally as a result of this episode. *Id.* at ¶¶ 37–38.

Plaintiff alleges that Mr. McElhinny's conduct was not only lauded by the other players and the coaches, *id.* at ¶ 25, but that the School District Defendants in fact "set up the drill in such a way that much smaller, inexperienced underclassmen would be pitted against larger, stronger,

_____

[2] At this stage, the Court must treat the averments of fact in the Complaint as being true.

more experienced upperclassmen." *Id.* at ¶ 17. Mr. Dorley claims that larger upperclassmen "would frequently exceed the scope of the drill" and that the School District Defendants "created an atmosphere that encouraged violence" by instructing upperclassmen to "exhibit their dominance, strength and aggression on the underclassmen in order to 'toughen them up.'" *Id.* at ¶¶ 18–19. Mr. Dorley also alleges "[t]he entire coaching staff . . . was watching attentively as the aforementioned events occurred, and witnessed plaintiff's injuries." *Id.* at ¶ 28. He further states that after injuring him, Mr. McElhinny and other upperclassmen "mocked plaintiff for his reaction." *Id.* at ¶ 26. The Complaint also alleges that the coaches "observed and encouraged similar [aggressive] behavior during the same drill" during the days of training camp leading up to the date on which Plaintiff was injured. *Id.* at ¶ 32.[3]

Mr. Dorley filed his Complaint in the Court of Common Pleas of Allegheny County, Pennsylvania. This action was removed to this Court and filed on its docket on February 17, 2015. ECF No. 1. The Complaint asserts eleven (11) counts: Counts I–VI are claims brought via 42 U.S.C. § 1983 against the School District Defendants for various Fourteenth Amendment Due Process Clause violations, specifically asserted claims for Injury to Human Dignity, Injury to Bodily Integrity, and Injury as a Result of a State Created Danger/Special Relationship. Count VII asserts a violation of Pennsylvania's Constitution for Injury to Bodily Integrity. Counts VIII–X contain state law claims against Mr. McElhinny for Battery, Intentional Infliction of Emotional Distress ("IIED") and Negligence, and Count XI is a state law claim against Mr. McElhinny's parents ("Parent Defendants") alleging Negligence and Vicarious Liability for their son's acts. All Defendants have filed Motions to Dismiss. ECF Nos. 5; 9. The Court has reviewed the Motions, the parties' briefs in support of and in opposition to them as well as supplemental briefs on the issue of qualified immunity, and heard oral argument on the matter.

---

[3] Seemingly directly contrary to what is pled at ¶¶ 15 and 16.

## II.    LEGAL STANDARD

A complaint which fails to state a claim upon which relief may be granted is properly dismissed.  Fed. R. Civ. P. 12(b)(6).  Courts assessing the sufficiency of a complaint must "accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009) (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)).  Claims must be facially plausible, meaning they must contain "'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010) (quoting *Iqbal*, 129 S. Ct. at 1949)).  They must "raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]." *Thompson v. Real Estate Mortg. Network,* 748 F.3d 142, 147 (3d Cir. 2014) (internal citation and quotation marks omitted).

## III.    DISCUSSION

The Court will first consider Mr. Dorley's federal claims against the School District Defendants, and will then turn to his state law claims against the Student Defendant and Parent Defendants.  All federal claims are asserted solely against the School District Defendants, while the state law tort claims are asserted only against Mr. McElhinny and his parents.[4]  As to the federal claims, the Court's analysis will focus on the claims filed against all School District Defendants in the first instance, and then the Court will more specifically address the claims against the School District itself.

### A.  Fourteenth Amendment Due Process Claims (Counts I–VI) and Application of the Qualified Immunity Doctrine

The federal claims in Plaintiff's Complaint assert several theories of liability.  Any such federal claim must allege that a plaintiff was deprived of a right secured by the Constitution or

---

[4] Plaintiff also alleges a violation of the Pennsylvania Constitution against the individual School District Defendants.

laws of the United States by a person acting with the authority of state law.[5] *Morrow v. Balaski*, 719 F.3d 160, 165–66 (3d Cir. 2013) (en banc), *cert. denied*, 134 S. Ct. 824 (2013). "The first step in evaluating a section 1983 claim is to identify the exact contours of the underlying right said to have been violated and to determine whether the plaintiff has alleged a deprivation of a constitutional right at all." *Nicini v. Morra*, 212 F.3d 798, 806 (2000) (en banc) (internal quotation marks omitted).

The Fourteenth Amendment provides procedural and substantive protections to citizens by ensuring that states shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. At issue is whether Mr. Dorley has adequately alleged a substantive due process violation against the School District Defendants for the injuries he sustained while participating in a football training camp drill.[6] Mr. Dorley alleges two (2) counts (one against the School District and one against the individual School District Defendants) on each of three theories of liability under the Fourteenth Amendment: (1) a violation of the right to human dignity; (2) a violation of the right to bodily integrity; and (3) a deprivation based on the state-created danger doctrine.

As an initial matter, the Court observes that our Court of Appeals has yet to expressly recognize or reject in a precedential opinion any claim which rises to the level of a substantive due process violation in regard to physical injuries caused by a fellow student in the interscholastic

_____

[5] The individual School District Defendants attack the Complaint on the grounds that Mr. Dorley fails to assert claims against them in their individual, as opposed to their official, capacities. The Court rejects this argument, as there are no magic words required to show that the Defendants are being sued in their individual capacities, but where the terms of the Complaint are amenable to that interpretation and Plaintiff advocates that he in fact is asserting claims against the officials in their individual capacity, *see* ECF No. 15, at 18–19, the Court properly assesses the claims accordingly, *Keys v. Carroll*, No. 10-1570, 2011 WL 1152135, at *3 (M.D. Pa. Mar. 28, 2011).

[6] Although Mr. Dorley also claims the conduct may have implicated his procedural due process rights, ECF No. 1-1, at ¶¶ 41; 48; 55; 64; 76; 87, no party has made any argument to that effect and the Court is at a loss to see what theory Plaintiff might seek to assert in that regard since the assertion of a procedural due process claim implies that there was some "procedure[] available to him [that] did not provide due process of law." *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 (3d Cir. 2006) (internal quotation marks and citation omitted). As pled, the Complaint here asserts no "procedural due process" claim.

sports context.[7]  In light of that, this Court is generally hesitant to federalize the nuances of the on-field conduct of interscholastic athletics, or to rush to endorse a view that such violations exist in the day-to-day conduct of high school sports, absent compelling circumstances.

Here's why.

The Supreme Court expects lower federal courts to act as gatekeepers when it comes to defining or expanding substantive due process protections. *See Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992) ("[T]he Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this unchartered area are scarce and open-ended. The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." (internal citation omitted)). Substantive due process violations are reserved for "conduct that shock[s] the conscience and [i]s so brutal and offensive that it d[oes] not comport with traditional ideas of fair play and decency." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998).  Courts are to "preserve the constitutional proportions of constitutional claims, lest the Constitution be demoted to . . . a font of tort law." *Id.* at 847 n.8; *see also Brown v. Commonwealth of Pennsylvania, Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 477–78 (3d Cir. 2003) ("The Supreme Court has repeatedly stated that 'the Due Process Clause of the Fourteenth Amendment . . . does not

---

[7] The Third Circuit itself recognized the dearth of precedential authority in this general area in *Spady v. Bethlehem Area Sch. Dist.*, __ F.3d __, No. 14-3535, 2015 WL 5103553, at *5 (3d Cir. Sept. 1, 2015).  That case asserted substantive due process claims against a school district and a gym teacher relating to the death of a student from secondary or "dry" drowning during a physical education class.  In *Spady*, our Court of Appeals declined to address whether a federal right had been violated, and instead held that the gym teacher was entitled to qualified immunity because it was not clearly established that a student had a "right to affirmative intervention by the state actor to minimize the risk of secondary or dry drowning." *Id.* at *4.  The court did appear to express some skepticism, however, about whether claims arising from physical injuries in a school activity setting could rise to constitutional violations. *See id.* at *6 ("To equate the intentional infliction of painful corporal punishment or the sexual molestation of a student, however, with a student-athlete's unfortunate accident during wrestling practice or a rare instance of delayed drowning after swim class is a bridge too far.").  That said, the *Spady* Court also recognized that "courts that have found colorable constitutional violations in school-athletic settings did so where state actors engaged in patently egregious and intentional misconduct." *Id.*  In light of this language, and for the reasons outlined below, the Plaintiff will be permitted to amend his Complaint if he can plausibly plead that his coaches engaged in conduct of the requisite level of culpability in violation of his substantive due process rights.

transform every tort committed by a state actor into a constitutional violation.'" (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 202 (1989)). The teaching of these cases is that not every act of a public body or official allegedly underlying a physical injury generates a federal constitutional claim, even where the injuries alleged are most serious (as they are here), or their conduct and motive is asserted to be arrogant, dismissive, callous or harsh (as they are so alleged here).

That said, as noted above, our Court of Appeals has not benched substantive due process claims involving injuries arising from school sports, and there is some support for them in its non-precedential opinions. *See Patrick v. Great Valley Sch. Dist.*, 296 F. App'x 258, 262 (3d Cir. 2008) (reversing and remanding in part a grant of summary judgment on the grounds that a genuine issue of material fact existed as to whether a coach was deliberately indifferent under the state-created danger theory of liability for a substantive due process violation); *Hinterberger v. Iroquois Sch. Dist.*, 548 F. App'x 50, 54 & n.2 (3d Cir. 2013) (holding qualified immunity protected coach from liability because the law was not clearly established without commenting on the propriety (or impropriety) of the substantive due process action asserted through the state-created danger theory) ("We note that cases decided in this circuit after Hinterberger's accident have not been models of clarity as to whether a state-created danger claim can be successfully maintained in the context of school sports."). To be sure, the Third Circuit has generally discouraged district courts from relying on its non-precedential decisions, *see Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 234 n.18 (3d Cir. 2013) (declining to address a case on which one party heavily relied because it was non-precedential); Third Circuit Internal Operating Procedure 5.7 (instructing that non-precedential "opinions are not regarded as precedents that bind

the [Third Circuit] because they do not circulate to the full court before filing") but here, they, and persuasive district court decisions, are what this Court has to go on.

The Court concludes that in the absence of a precedential Circuit opinion definitively holding whether school sports injury cases can or cannot (and if so, under what circumstances may) include a substantive due process claim, unpublished Court of Appeals cases do provide some guidance regarding the reasoning our Court of Appeals would counsel applies in similar circumstances, as does that court's observations in *Spady* about when such liability has been recognized. The prudent course here is to give due regard to the analyses of those decisions, along with those of the numerous opinions of the district courts within our Circuit addressing similar claims in similar settings.[8] Recognizing the general tenor of Mr. Dorley's allegations, though deficient as pled in their current form, the Court concludes that a federal substantive due process claim could arise here.

As in other official conduct § 1983 cases, the Court is also obligated to bear in mind that qualified immunity shields government officials from liability for civil damages unless the official's conduct "violate[s] clearly established statutory or constitutional rights of which a

---

[8] And there are many. Here is a sampling of them: *M.U. v. Downingtown High Sch. E.*, __ F. Supp. 3d __, No. 14-04877, 2015 WL 1893264 (E.D. Pa. Apr. 27, 2015) (dismissing complaint but granting leave to amend some claims when student athlete sustained concussion during soccer scrimmage); *Mann v. Palmerton Area Sch. Dist.*, 33 F. Supp. 3d 530 (M.D. Pa. 2014) (denying motion to dismiss case alleging state-created danger theory against coaches and school district when student sustained traumatic brain injury during football practice); *Moeck v. Pleasant Valley Sch. Dist.*, 983 F. Supp. 2d 516 (M.D. Pa. 2013) (denying motion to dismiss state-created danger claims when a high school wrestler sustained injuries while practicing against a much heavier teammate); *Lavella v. Stockhausen*, No. 13-0127, 2013 WL 1838387 (W.D. Pa. May 1, 2013) (granting motion to dismiss but granting leave to amend when a cheerleader sustained concussions and sued her coach under a state-created danger theory); *Alt v. Shirey*, No. 11-0468, 2012 WL 726579 (W.D. Pa. Feb. 7, 2012) *report and recommendation adopted*, 2012 WL 726593 (W.D. Pa. Mar. 1, 2012) (recommending that a motion to dismiss be granted in part but also denied in part as related to claims alleged *via* the state-created danger theory when a student sustained head injuries during football games); *Leonard v. Owen J. Roberts Sch. Dist.*, No. 08-2016, 2009 WL 603160 (E.D. Pa. Mar. 5, 2009) (granting motion to dismiss case brought under state-created danger theory against track and field coaches when athlete was injured by javelin thrown by a fellow student); *Yatsko v. Berezwick*, No. 06-2480, 2008 WL 2444503 (M.D. Pa. June 13, 2008) (granting motion to dismiss on state-created danger theory when student sustained injury from head-to-head collision during basketball game); *Sciotto v. Marple Newton Sch. Dist.*, 81 F. Supp. 2d 559 (E.D. Pa. 1999) (denying summary judgment on state-created danger theory when high school wrestler practicing with alumnus wrestler at organized practice suffered serious injuries).

reasonable person would have known." *Estate of Lagano v. Bergen Cnty. Prosecutor's Office*, 769 F.3d 850, 858 (3d Cir. 2014) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The two-step test for assessing whether qualified immunity applies in a given case is whether (1) the complaint alleges "sufficient facts to establish the violation of a constitutional right," and whether (2) that "right was 'clearly established' at the time of the defendant's actions." *Id.* (quoting *Pearson*, 555 U.S. at 231). In an effort to address the potential applicability of the doctrine of qualified immunity "at the earliest possible stage of a litigation," *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987), this Court ordered supplemental briefing on that issue in this case, ECF No. 21; *see also Doe v. Delie*, 257 F.3d 309, 312, 322 n.13 (3d Cir. 2001) (affirming order dismissing claims against a defendant after qualified immunity was raised *sua sponte*).

The Court asked for, and received, submissions from the parties on the application of qualified immunity here. ECF Nos. 22; 23; 24; 25. The Court concludes that application of that doctrine will be far better measured against more precisely articulated claims after any potential amendment of the Complaint. In fact, a focus on definitional precision is directed by *Spady*, 2015 WL 5103553, at *4. As explained in greater detail below, the Plaintiff does not sufficiently allege a federal claim at this point. Without a less muddled, clearer description of the challenged conduct (and the motive and intent behind it) which Plaintiff asserts establishes a federal constitutional violation and the definition of that right, the Court cannot assess (1) whether that conduct allegedly violated a constitutional right at all and (2) whether that right was clearly established at the time of the alleged violation. Resolution of the parties' arguments as to qualified immunity will therefore be considered if and when they are reasserted.

That all said, the Court will now explain why the Complaint as pled fails to allege the deprivation of a federal right.

### 1. Human Dignity Claims

Counts I and IV allege violations of Plaintiff's "right to human dignity" under the Fourteenth Amendment. The School District Defendants contest the very existence of an actionable "right to human dignity" under the Fourteenth Amendment, at least in this context. ECF Nos. 10, at 5 n.1; 16, at 2–3. Plaintiff does not identify in his briefing[9] any binding authority recognizing a separate and distinct claim based on the "right to human dignity" outside the prisoner context, and particularly not in school sports cases.

This thread of Fourteenth Amendment substantive jurisprudence exists, but it does so principally in coerced custodial or penal settings. While Plaintiff does cite several cases that use the words "human dignity," each is inapposite to the facts of this case, since each deals with conditions or actions taken with regard to penal incarceration. *See* ECF No. 15, at 6–7 (citing *Rochin v. California*, 342 U.S. 165, 174 (1952) (finding due process violation when drug capsules obtained from forcibly pumping an inmate's stomach were admitted to convict the defendant); *Yoder v. Cumberland Cnty.*, 278 A.2d 379, 389 (Me. 1971) (incarceration without due process affronts human dignity); *Lamb v. Hutto*, 467 F. Supp. 562, 567 (E.D. Va. 1979) (recognizing that "conduct that can be classified as offensive to human dignity can constitute a deprivation of liberty" and concluding a prisoner's allegations that he was continuously beaten, kicked, and dragged throughout the building were offensive). Mr. Dorley does cite *E.N. v. Susquehanna Twp. Sch. Dist.*, No. 09-1727, 2010 WL 4853700, at *6 (M.D. Pa. Nov. 23, 2010), which does not mention "human dignity" but instead only states that "[t]he Fourteenth Amendment protects individuals from arbitrary government interference with certain protected liberty interests. An individual's interest in bodily integrity—to be free from physical abuse or unwanted medical

---

[9] Nor did his counsel point to one during oral argument.

treatment by government officials—is among the fundamental liberty interests protected by the Fourteenth Amendment."

Plaintiff also cites to the report and recommendation in *Alt v. Shirey*, No. 11-468, 2012 WL 726579, at *4 (W.D. Pa. Feb. 7, 2012) *report and recommendation adopted*, No. 11-468, 2012 WL 726593 (W.D. Pa. Mar. 1, 2012), which addressed a complaint alleging substantive due process violations including one for injury to human dignity. However, the facts in *Alt* presented a very different picture.

There it was alleged that a high school football player was involved in a "helmet to helmet" on-field collision, leaving him clearly disoriented, aimlessly walking the sideline. *Id.* at *2. Teammates reported his erratic behavior to the coaches. *Id.* He was then ordered by a coach to re-enter the game, and to intentionally "blow[] up" an opponent, which he did, causing that player further and palpably visible serious cognitive injury, putting him into a "drunken state." *Id.* It was alleged that the defendant coaches knew all of this, and simply brushed the matter off, urging the plaintiff's mother to take him home and "put him to bed." *Id.* at *3. Against that backdrop, Chief Judge Lenihan recommended a conclusion that these allegations as pled had crossed the line from "possible" to "plausible" as sufficiently egregious so as to "shock the conscience," and offend judicial notions of fairness. *Id.* at *7.

While in those circumstances, it might be said that the defendants' knowing actions in the face of existing severe physical injuries could plausibly be said to "shock the conscience" and offend human dignity, in the Court's estimation, the factual allegations as pled here fall short of the "intentional disregard of actual injury/specific direction to cause injury" scenario in *Alt*. To be sure, Plaintiff's allegations paint a picture of adults arranging a situation where there was a risk of injury, but as explained further below, the allegations here also include contrary assertions that the

involved drill was designed and intended to ameliorate such risks. The facts in *Alt* are in clear contrast. Further, in the specific context presented here, the Court believes that these Counts (Counts I and IV) merge with those of Counts II, III, V, and VI, *see Sciotto*, 81 F. Supp. 2d at 570 (constitutional right implicated is one related to invasion of bodily integrity), and as such, Counts I and IV will be dismissed.

### 2. *Right to Bodily Integrity and State-Created Danger Claims*

Counts II and V allege violations of Plaintiff's right to bodily integrity under the Fourteenth Amendment. The Court concludes that in the context of this case, there is no analytical distinction between this type of claim and those asserted in Counts III and VI, which allege injuries resulting from a "state-created danger." This is because the state-created danger doctrine is one theory used to assert a claim for harm to one's bodily integrity—the deprivation of bodily integrity does not have distinct legal standing on its own. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008) (recognizing that "[i]ndividuals have a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment," but explaining that the State lacks an affirmative obligation to protect its citizens from harm to that interest unless an exception to that principle, such as the state-created danger doctrine, applies); *Bennett ex rel. Irvine v. City of Phila.*, 499 F.3d 281, 286 (3d Cir. 2007) (describing the cause of action at issue as "a claim under 42 U.S.C. § 1983 for violation of [plaintiffs'] due process right to bodily integrity from harm inflicted by private parties under the state-created danger doctrine" and assessing the claim solely under the state-created danger theory).[10] The Court will therefore

---

[10] The Court's conclusion in this regard is bolstered by the fact that Plaintiff labeled a section of his opposition brief "Plaintiff Has Also Sufficiently Alleged His Claims for Bodily Integrity in Counts II and V of His Complaint" and yet refrained from including in that section any analysis of how the facts as pled could establish the elements of anything other than a state-created danger claim. ECF No. 15, at 8–11. He spent multiple pages explaining why the facts adequately allege a policy, practice, or custom under *Monell*, but does not actually mention the term "bodily integrity" anywhere else within those pages. It is true that Plaintiff does not need to prove his case at this early stage of litigation, *see* ECF No. 15, at 11, but he must at least specifically allege facts that establish the elements of causes of

consider the claims alleging harms to Mr. Dorley's bodily integrity via the state-created danger theory.[11]

Turning to the merits of the state-created danger counts, the Court concludes that as pled, they do not state a cause of action. However, Mr. Dorley will be granted leave to amend his Complaint because a curative amendment would not necessarily be futile as a matter of law. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008) ("We have instructed that if a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile.").[12]

The general rule under the Due Process Clause is that the state has no affirmative duty to protect its citizens from harms caused by other private citizens.[13] *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). In *DeShaney*, the Supreme Court recognized one exception to that rule for situations in which the state takes physical custody of a person (through, *e.g.*, incarceration or institutionalization) and thus creates a "special relationship" obligating it to protect the citizen. *Morrow v. Balaski*, 719 F.3d 160, 167 (3d Cir. 2013) (en banc), *as amended* (June 14, 2013*), cert. denied*, 134 S. Ct. 824 (2013) (citing *DeShaney*, 489 U.S. at 200). *DeShaney*

---

action upon which he seeks relief, and which are not redundant. *Cf. M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist.*, 43 F. Supp. 3d 412, 419 (M.D. Pa. 2014) ("[C]onsidering the large number of Counts and Defendants named in the complaint, the Court is persuaded that retention of redundant official capacity claims would cause confusion and would unnecessarily clutter the docket.").

[11] Thus, Counts II and V will also be dismissed as duplicative.

[12] The Court believes that *Phillips* requires that leave to amend be granted, but notes that once the involved Motions to Dismiss were filed, Plaintiff could have "amend[ed] to meet them" as a matter of right, Fed. R. Civ. P. 15(a), but chose not to do so. In that regard, it could be said that he wanted to "wait and see," a litigation maneuver otherwise frowned upon by our Court of Appeals. *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273–74 (3d Cir. 2001); *Reginella Const. Co. v. Travelers Cas & Sur. Co. of Am.*, 971 F. Supp. 2d 470, 479–80 (W.D. Pa. 2013), *aff'd sub nom. Reginella Const. Co. v. Travelers Cas. & Sur. Co. of Am.*, 568 F. App'x 174 (3d Cir. 2014). Nonetheless, on balance, and in light of the intervening decision in *Spady*, the Court believes that granting leave to amend is the proper course here. *See Lavella*, 2013 WL 1838387, at *4 (granting leave to amend in similar circumstances); *Yatsko*, 2008 WL 2444503, at *6 (same).

[13] And here, the harm (the broken arm) was caused by a private citizen, Mr. McElhinny.

also alluded to another exception which imposes a similar duty to protect when "the state's own actions create the very danger that causes the plaintiff's injury," *id.* at 167 (internal citation omitted); *Kneipp v. Tedder*, 95 F.3d 1199, 1201 (3d Cir. 1996). Here, the alleged harm to Mr. Dorley was directly caused by the Student Defendant (Mr. McElhinny), a third party, non-state actor. Therefore, the special relationship and state-created danger theories are the only ones potentially available to Mr. Dorley for his alleged claims against the School District Defendants.[14]

> To assert a claim under the state-created danger doctrine, plaintiffs must show that:
>
> (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts . . . and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006) (footnotes and quotation marks omitted). The School District Defendants challenge each element except the third.[15]

The first element of the state-created danger test requires plaintiffs to plausibly plead that the harm sustained was both "foreseeable and fairly direct." *Henry v. City of Erie*, 728 F.3d 275, 282 (3d Cir. 2013). Foreseeability requires that officials were actually aware, and thus on notice, of the risk of harm, *id.* at 282, while the "fairly direct" element requires that defendants' actions cannot be "separated from the ultimate harm by a lengthy period of time and intervening forces and actions," *id.* at 285. This element generally addresses whether the harm caused was "'too

---

[14] Although Plaintiff identifies Counts III and VI as "State Created Danger/Special Relationship" claims, *see* ECF No. 1-1, at 13, 19, he did not raise the "special relationship" exception in either his brief or in oral argument. Instead, he focused on the state-created danger theory. The Court concludes that the special relationship theory does not apply here, a conclusion our Court of Appeals has generally endorsed with regard to children attending public schools. *See D.R.. by L.R. v. Middle Bucks Area Vocational Technical Sch.*, 972 F.2d 1364, 1371–72 (3d Cir. 1992) (en banc) (declining to recognize a special relationship between public school students and the state because the students and their parents maintain control over their daily needs and determine where the students attend school, unlike prisoners who are "wholly dependent upon the state for food, shelter, clothing, and safety" and are "not free to leave").

[15] Since the School District Defendants do not contest that Mr. Dorley has alleged facts establishing the third prong of the test, the Court will assume without deciding that Plaintiff's claims meet that element.

attenuated' to justifiably hold the defendant liable." *M.U.*, 2015 WL 1893264, at *6 (internal quotation marks and citation omitted).

The Court concludes that taking the facts alleged in the Complaint as true and drawing all reasonable inferences in Mr. Dorley's favor, the Complaint is deficient as it relates to the first prong. Mr. Dorley alleges that the individual School District Defendants were varsity football coaches, ECF No. 1-1, at ¶¶ 3–5, and that during football training camp they "created an atmosphere that encouraged violence" by instructing upperclassmen to "exhibit their dominance, strength and aggression on the underclassmen in order to 'toughen them up,'" *id.* at ¶¶ 18–19. Mr. Dorley contends that they did so by "set[ting] up [a blocking] drill [conducted without pads] in such a way that much smaller, inexperienced underclassmen would be pitted against larger, stronger, more experienced upperclassmen," and that upperclassmen "would frequently exceed the scope of the drill . . . and use excessive and unnecessary force in doing so." *Id.* at ¶¶ 17–18.

These allegations as currently pled do not clear the Rule 12(b)(6) hurdle. While the claims do sufficiently allege that there was no inordinate amount of time between the Defendants' alleged establishment of the drill and Mr. Dorley's injuries, there is a question as to whether the risk of harm was foreseeable. Although Mr. Dorley alleges that the coaches "had observed and encouraged similar behavior during the same drill, characterized by large and overly aggressive upperclassmen pitted against much smaller underclassmen," *id.* at ¶ 32, the Complaint contains no allegation that any harm resulted from the drill prior to Mr. Dorley's injury, nor any other indicia of foreseeable likelihood of Plaintiff's injury. Indeed, as to this point, the Complaint actually directly contradicts itself, stating on one hand that the coaches devised a dangerous drill, but then on the other that the drill by design "was not supposed to be done at full speed, and was described in advance by [the School District Defendants] as 'non-contact,'" *id.* at ¶ 16, and that in fact the

Student Defendant exceeded the scope of that drill, *id.* at ¶¶ 23; 103. If the coaches were not on some plausible notice of the concrete risk of a sufficiently serious injury, their actions would not satisfy the first prong of the test. *Henry*, 728 F.3d at 282.

Further, given this internal contradiction, there are not at this point plausible facts pled which would allow the Court to infer that the coaches had actual knowledge which would put them on notice that conducting this "non-contact by design" drill would nonetheless result in injury to students. *Cf. M.U.*, 2015 WL 1893264, at *9 (concluding that the first prong of the state-created danger test was met when a soccer coach returned a player to a game after a blow to the head because the coach would know the player's risk of harm was elevated in a full contact game of soccer).[16] Such an inference might be drawn, for instance, from an allegation based on reasonable belief that the coaches had witnessed prior, serious injuries (or even near-injuries which would lead to serious harm) during this specific form of drill, *see Sciotto*, 81 F. Supp. 2d at 564 (denying summary judgment for defendant on first prong partially because wrestling coach "was aware of a prior injury suffered by a [high school wrestler] while 'live wrestling' with an alumnus"), or from specific facts indicating that contrary to the drill's "non-contact" design, the coaches knew upperclassmen consistently turned the drill into a dangerous, full contact drill and did nothing to stop it, or from other facts from which the inference could plausibly be drawn that there was a palpable risk of serious injury from a drill with no legitimate and reasonable "football purpose" either as designed or as actually implemented.

---

[16] This case is also distinguishable from other football cases in which players sustained concussions after coaches failed to take them out of games or otherwise assess them for concussion symptoms. *See Mann v. Palmerton Area Sch. Dist.*, 33 F. Supp. 3d 530, 538 (M.D. Pa. 2014) (holding first prong satisfied when the complaint alleged the coaches knew that allowing a football player to continue to participate in athletic activities after sustaining a concussion and that a student sustained a second concussion after coaches placed him back into practice). Here, there is no allegation that Mr. Dorley or any other player had previously sustained any injury.

The second element of the state-created danger analysis asks whether a plaintiff has plausibly pled that a defendant's culpability "shocks the conscience." *Bright*, 443 F.3d at 281. "[N]egligence is not enough to shock the conscience under any circumstances." *Schieber v. City of Phila.*, 320 F.3d 409, 419 (3d Cir. 2003). To shock the conscience in the context of this theory of liability requires facts suggesting that officials acted with "deliberate indifference" or, in some more limited circumstances, with "intent to cause harm." *See Sanford v. Stiles*, 456 F.3d 298, 309 (3d Cir. 2006) (per curiam) (explaining that in situations requiring officials to make decisions without time to deliberate, the standard is heightened and plaintiffs must show intent to harm instead of simply deliberate indifference).[17]

The coaches in this case were seemingly not acting in a "hyperpressurized environment," such as a high speed car chase. Instead they operated in an environment where they could make "unhurried judgments" about the types of drills conducted at the football training camp and their actions with respect to those drills. Instead the deliberate indifference standard governs their actions here, *Walter v. Pike Cnty., Pa.*, 544 F.3d 182, 192 (3d Cir. 2008) (internal citation and quotation marks omitted); a state official acts with deliberate indifference when he "'consciously disregard[s] a substantial risk of serious harm.'" *Kaucher v. Cnty. of Bucks,* 455 F.3d 418, 427 (3d Cir.2006) (quoting *Ziccardi v. City of Phila.,* 288 F.3d 57, 65 (3d Cir.2002)) (internal quotation marks omitted). The Third Circuit has not yet decided whether this standard is met when officials "*should have known* about a risk but did not, as opposed to when they *actually* knew of a risk," *Benedict v. Sw. Pennsylvania Human Servs., Inc.*, __ F. Supp. 3d __, No. 14-0678, 2015 WL 1359147, at *13 (W.D. Pa. Mar. 24, 2015) (internal citations omitted) (emphasis in original); *see*

---

[17] While the term "shocks the conscience" is used in conjunction with both a "human dignity" claim and as an element of the state-created danger theory, they are not the same thing. In the former setting, the focus is on the substance of the affirmative conduct of the state actor (*e.g.*, police-induced stomach pumping, or beatings by prison guards), as opposed to the degree of culpability with which a state actor creates the risk of harm by a third party (*e.g.*, "deliberate indifference.").

*also Nicini*, 212 F.3d at 812 (assuming without deciding that the "should have known" standard is applicable); *Patrick*, 296 F. App'x at 262 n.3 ("We note that this Court has not yet clarified whether actual knowledge of a risk is required to establish deliberate indifference in a state-created danger claim."), but our Court of Appeals has "expressed approval of a subjective standard," *Kaucher*, 455 F.3d at 427 (3d Cir. 2006). In any event, the conduct of officials at least "must evince a willingness to ignore a foreseeable danger or risk," *Morse,* 132 F.3d at 910.

As with the first prong, the allegations in the Complaint as pled are deficient when considering the second prong of the state-created danger test. The Court cannot say as a matter of law that the facts pled "evince a willingness to ignore a foreseeable danger or risk," *Morse,* 132 F.3d at 910, when those facts do not plausibly set out such a foreseeable risk. Especially since the Complaint is internally contradictory on the manner in which the drill was structured and the coaches' actions, intent, and motive with respect to conducting it, the Court cannot conclude that conduct by the School District Defendants as pled amounted to more than negligence.

For instance, if this was the first time any injury had resulted from the drill it may be difficult to say that the coaches were deliberately indifferent such that they "consciously disregard[ed] a substantial risk of serious harm." *Kaucher,* 455 F.3d at 427 (internal quotation marks and citations omitted); *cf. Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 257 (3d Cir. 2010) (discussing playing tackle football without equipment in the Eighth Amendment context, stating that "[t]he mere possibility that an injury may result from an activity does not mean that there is a 'substantial risk' of that injury occurring"). By the same token, given the inherently contradictory assertions of the Complaint, it also cannot be plausibly said that the coaches were otherwise on notice that this specific drill, at this football camp, was so inherently dangerous that they were deliberately indifferent to a risk of serious harm, previous injury or not.

Why is this so?  As a general matter, it is not necessarily negligent, let alone indicative of deliberate indifference, to run a football camp with players of differing sizes confronting one another.  That a drill pits larger players against smaller ones alone is insufficient—that is often what happens in football games—and it is especially the norm when the drill is pled to have been designed to be performed without contact.[18]  The Complaint falls short of pleading a plausible factual basis to conclude that what was before the coaches was a clear enough scenario to support the conclusion that they were deliberately indifferent to the risk of the injury which Plaintiff suffered.

The Complaint also asserts insufficient plausible facts which might otherwise support an inference of deliberate indifference such as (1) that Mr. Dorley (or anyone else) voiced concern about the drill's structure, *see M.U.*, 2015 WL 1893264, at *10 (holding the second prong not met and finding it "particularly relevant that [the student did] not allege that she made any subjective complaints" or "asked to come out of the game," in addition to not "display[ing] any objective signs that she had suffered a concussion during the game"); or (2) that there was objective evidence that he was or would likely be injured by participating in it, *see Patrick*, 296 F. App'x at 261 (concluding that a jury could find the second prong met when, among other things, a coach matched a heavier wrestler with a lighter one when the coach wanted to provide the heavier wrestler with a practice partner but none of comparable weight was available (and he had done so on other occasions)); *Alt*, 2012 WL 726579, at *12 (recommending denial of motion to dismiss when coaches forced plaintiff back into a football game and ordered him to "deliver a substantial

---

[18] Football is a dangerous sport even when played correctly.  *See* Timothy B. Fitzgerald, Comment, *The "Inherent Risk" Doctrine, Amateur Coaching Negligence, and the Goal of Loss Avoidance*, 99 Nw. U. L. Rev. 889, 929 (2005) ("There can be little doubt that competitive sports involve an array of 'open and obvious' dangers. . . . For example, football players implicitly acknowledge, understand, and accept the risk of being tackled.").  Case law differentiates claims involving "patently egregious and intentional misconduct" from those asserting harm arising from "typical risks . . . associated with participation in athletic activities."  *Spady*, 2015 WL 5103553, at *6.

hit to his opponent" knowing that he had previously sustained a head injury); or (3) that the coaches otherwise showed a "willingness to ignore a foreseeable danger or risk," *Morse,* 132 F.3d at 910, or (4) that more generally, the drill as designed or executed served no legitimate and reasonable teaching purpose, but was instead conducted for the amusement or edification of the coaches or other players, or otherwise without any rational relationship to the intended purpose of the practice in an interscholastic setting.[19]

In considering the claims against both the School District Defendants and the Student Defendant, the Court notes that as a general matter, pleading inconsistent claims is permissible under the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). However, inconsistent allegations "must still have a plausible basis grounded in fact." *Kovach v. Turner Dairy Farms, Inc.*, 929 F. Supp. 2d 477, 500 (W.D. Pa. 2013) (citing *Iqbal*, 556 U.S. at 663, 129 S.Ct. 1937). The ability to plead alternatively is not limitless. For instance, such alternative pleading has been permitted where the allegations of a complaint are that a defendant's actions were either pretextual, or if true, unlawful. *Independent Enterprises, Inc. v. PSWA*, 103 F.3d 1165, 1175–76 (3d Cir. 1997). But where one factual assertion negates an essential element of a contrary assertion, that conflict cannot stand, absent sufficient explanation. *Cleveland v. Policy Mgt. Sys. Corp.*, 526 U.S. 795, 805-07 (1999). Finally, legal conclusions, or conclusory facts, may not contradict the detailed factual allegations of the Complaint. *Chicago Police Sgts. Ass'n. v. City of Chicago*, No. 08-4214, 2011 WL 2637203 at *6–7 (N.D. Ill. July 6, 2011).

Measured against that standard, the Court has doubts as to whether each of two (2) separate (and arguably inconsistent) pleading "theories" advanced by the Plaintiff is plausible as now pled.

---

[19] The type of physical interaction, and level of foreseeable risk which falls short of, or meets, the test for a deliberate indifference to a risk of serious harm may, of course, vary based on the level of the participants *e.g.*, Pop Warner v. high school v. college v. NFL.

The first theme pled is that the drill was designed as a low-speed, no pads, non-contact drill, ECF No. 1-1 at ¶¶ 15–16, and that the Student Defendant, Mr. McElhinny, "exceeded the scope" of the drill, *id.* at ¶ 103 (and presumably exceeded the scope of the coaches' instructions "in advance" of the drill that it should be "non-contact," *id.* at ¶ 16), by "lung[ing] full speed into plaintiff, driving him back" beyond the "10 yard prescribed limit for the drill" and then giving Mr. Dorley "one final violent shove, throwing plaintiff into the air and causing him to flip over" and break his arm, *id.* at ¶ 23. The second theme pled is that the School District Defendants specifically designed and conducted a drill in such a way that "encourgag[ed] . . . upperclassmen to overexert their force and aggression on the underclassmen in non-contact drills" and resulted in violent injuries. ECF No. 1-1, at ¶ 30.

Although it is *possible* that both of these arguments could be true under a given set of facts, one's truth may so significantly undermine the other so as to render at least one theme (if not both) implausible. If the Student Defendant actually exceeded the scope of the drill as established by the coaches (which Plaintiff specifically pleads was described by the coaches as "no contact," *id.* at ¶ 16, making it reasonable to conduct the drill without pads and helmets), then there is no obvious logical or plausible basis to conclude that the Defendant coaches acted with deliberate indifference to a foreseeable risk of harm in setting up the drill in the first place. By the same token, if the coaches specifically designed the drill to make it excessively dangerous by making it full contact/no pads (either intentionally or with a knowing wink), then it would be a very unusual situation in which a student athlete would be personally liable for following his coaches' instructions during football practice.[20]

---

[20] For instance, given the Complaint's repetitive allegations that this was set up to be a low-speed, non-contact drill, it is not pled as a situation in which the risk of injury from participation in the drill as designed would have been patently obvious to a player and coach alike. Nor is it a case in which it is plausibly pled that notwithstanding the stated non-contact design of the drill, the coaches *and* the players had a pre-designed plan to make it into something else.

Of course, these claims are not necessarily inconsistent in all conceptions. Is it *possible* to plead some combination of these theories of liability in such a way that they may coexist? Yes. It is possible that the coaches affirmatively designed a dangerous drill and then acted with deliberate indifference when implementing that drill at the training camp, *and* that the Student Defendant also went beyond the scope of the coaches' instructions, dangerous in and of themselves. But that is not what the Plaintiff pleads here. In the Court's estimation, the Plaintiff's current pleading asserts theories and detailed facts so inherently in tension with one another that they lack the requisite plausibility to withstand the Motion to Dismiss as to the first and second prongs of the state-created danger test.

The fourth element of the state-created danger test requires an affirmative act on the part of a state official to place a plaintiff in danger. *Bright*, 443 F.3d at 281. If allegations in a complaint are "at their core, [] omissions, not commissions—inactions rather than actions," the fourth prong cannot be met. *Phillips*, 515 F.3d at 236. Our Court of Appeals has cautioned that while "the line between action and inaction is not always easily drawn," courts should be wary of claims which attempt to transform "[a]ny and all failures to act . . . into an affirmative exercise of authority." *Morrow*, 719 F.3d at 178. Courts must assess at this prong whether state officials "created or increased the risk" themselves, or whether they simply "might have done more" to protect individuals from harm. *Morrow*, 719 F.3d at 179.

In assessing the facts as pled in the Complaint, the Court concludes that Mr. Dorley does sufficiently and plausibly plead the fourth element of the state-created danger test. He does not couch his claims solely in "failure to protect" language (though he relies on such language at some points) but also includes facts which, taken as true, establish that the coaches affirmatively conducted the camp and specifically designed the drill at issue. Here, the state actors are not

characterized only as merely passive bystanders who failed to take Mr. Dorley out of harm's way or failed to assess his injuries, assertions which other courts have found insufficient to satisfy the fourth prong.  *See M.U.*, 2015 WL 1893264, at *11 (concluding that soccer coach's actions were of "omission in that he failed to take her out of the game, failed to evaluate her for a concussion, and failed to send her for a medical evaluation").  Rather, in at least part of the Complaint, they are alleged to have affirmatively implemented the drill in question in a dangerous manner.  ECF No. 1-1, at ¶ 16.  The conduct alleged goes beyond charging that they failed to protect Mr. Dorley from the alleged overly aggressive conduct of an upperclassman in the setting of a football drill, and it thus satisfies the fourth element.[21]

    To sum up, the Complaint falls short as to whether the drill and the manner in which the coaches implemented it actually presented a foreseeable and fairly direct risk of harm (Prong One), and/or whether the alleged conduct amounted to deliberate indifference such that the coaches' conduct was patently egregious (Prong Two).  On a football field (practices and games), larger players will be pitted against smaller players.  Because of this reality, smaller players require (and will have) experience competing in some fashion against larger players.  Such a structure is not

---

[21] As to this prong, the Court finds Judge Pappert's comparison of various school sports cases in *M.U.* particularly instructive.  The *M.U.* Court compared a number of cases in which defendants "instructed," "forced," "required," or "compel[ed]" plaintiffs to participate in dangerous conduct (and therefore met the fourth prong through their affirmative action) with cases in which defendants' actions were more passive in that they "did not prevent" a plaintiff from playing, "fail[ed]" to take steps to ensure the student's safety, or "asked" plaintiff to participate (which did not amount to affirmative acts sufficient to satisfy the fourth prong).  2015 WL 1893264, at *11; *see also id.* (holding the fourth prong not satisfied when the Complaint only alleged that the defendant "failed" to take the student out of the game, assess her injuries, and send her for medical treatment).

Although some language of Mr. Dorley's Complaint is framed in terms of passive inaction, *see, e.g.*, ECF No. 1-1, at ¶ 89 ("The fact that defendants . . . *saw* [the conduct take place]") (emphasis added); *id.* at ¶ 90 (alleging that the coaches "*allow[ed]* the drill to proceed") (emphasis added); *id.* at ¶ 92 (alleging the coaches caused harm "by way of the defendant' action *or inactions*") (emphasis added), the Complaint also alleges that the School District Defendants "created an atmosphere that encouraged violence, arrogance and discrimination of the underclassmen" in which they "encouraged [upperclassmen] to exhibit their dominance, strength, and aggression on the underclassmen in order to 'toughen them up,'" "encouraged those upperclassmen to overexert their force and aggression on the underclassmen in non-contact drills," and "set up the drill in such a way that much smaller, inexperienced underclassmen would be pitted against larger, stronger, more experienced upperclassmen," *id.* at ¶¶ 17; 19; 30.  Taken together, and drawing all reasonable inferences in Plaintiff's favor, the Court concludes that these allegations do meet the fourth prong of the state-created danger test.

inherently suspect, and a real world drill involving such disparate students, but that does not have such a foreseeable risk of serious injury to which the coaches and School District were deliberately indifferent, would not trigger Fourteenth Amendment "bodily integrity/state-created danger" liability. On the other hand, a drill designed and/or conducted for no rational football purpose, in circumstances such that the "adults in the room" were on notice that serious injuries were foreseeable from the drill because of the way they structured or conducted it, and that they demonstrated deliberate indifference to a serious risk of harm that was above and beyond the ordinary, objectively anticipated risks associated with voluntary participation in interscholastic football, would be a very different situation. Therefore, the claims asserted under § 1983 for injuries to Plaintiff's bodily integrity under the state-created danger theory against the School District Defendants (Counts II, III, IV, and V) will be dismissed, but without prejudice and with leave to amend.[22]

## B. School District Liability

The claims of a Fourteenth Amendment violation alleged by Mr. Dorley are brought not against just the individual School District Defendants, but also against the School District itself. ECF No. 1-1, at Counts I–III. Mr. Dorley frames his claims in municipal liability terms under

---

[22] The Court will dismiss with prejudice Count VII, which is a claim against the individual School District Defendants for violations of the Pennsylvania Constitution. That claims does not exist. As another district court in this Circuit recognized:

> Pennsylvania courts do not recognize a cause of action for monetary damages for alleged violations of the due process rights provided under the Pennsylvania State Constitution. *Jones v. City of Philadelphia,* 890 A.2d 1188, 1209 (Pa. Commw. Ct. 2006) (en banc) ("To date, neither Pennsylvania statutory authority, nor appellate case law has authorized the award of money damages for a violation of the Pennsylvania Constitution."); *Pursel v. McCartney,* 2006 Pa. Dist. & Cnty. Dec. LEXIS 260 (Pa. County Ct. 2006) (applying *Jones* to find that "there is no cognizable cause of action for monetary damages for alleged violation of Article I, Section 1 [the Due Process Clause] of the Pennsylvania Constitution.").

*Bell v. Twp. of Concord*, 759 F. Supp. 2d 621, 630 (E.D. Pa. 2011); *see also Balletta v. Spadoni*, 47 A.3d 183, 193 (Pa. Commw. Ct. 2012) ("In short, there is no Pennsylvania state case law that permits an action for monetary damages based on a claimed violation of the state constitution.").

Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), alleging in all three such claims that "Defendant [South Fayette School District]'s actions and/or inactions demonstrated an adopted practice, custom or policy of deliberate indifference to plaintiff's overall health, safety and welfare." ECF No. 1-1, at ¶¶ 43, 50, 59. Using exactly the same conclusory and boilerplate phrasing in all three such Counts, Mr. Dorley asserts:

> The adopted practice, custom or policy is demonstrated by the fact that plaintiff and other smaller, weaker and younger underclassmen were frequently pitted against much larger, stronger and older upperclassmen during "contact" drills, when none of the players were outfitted with proper protective equipment, and when the upperclassmen had previously demonstrated excessive aggression and violence in such drills against underclassmen, such as plaintiff.

*Id.* at ¶¶ 44, 51, 60.[23]

The Third Circuit has held that a municipality may be "independently liable for a substantive due process violation even when none of its individual employees is liable." *Sanford v. Stiles*, 456 F.3d 298, 314 (3d Cir. 2006) (citing *Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir.2003)).[24] However, it is well established that a School District, like a municipality, "cannot be liable solely as an employer because there is no *respondeat superior* theory of municipal liability in § 1983 actions." *Brown*, 318 F.3d at 482.

---

[23] Additional factual averments that could be construed as supporting these claims are at ECF No. 1-1, at ¶¶ 17, 19, 22, 29–30, 33, 34–36. However, most of these paragraphs assert actions undertaken and specifically witnessed by the coaching staff without tying in any more superior School District decision-maker in any way. Indeed, many of the paragraphs merely lump the School District into an allegation in general terms without any further facts in support of it. *See, e.g., id.* at ¶ 17 ("Defendants SFSD [South Fayette School District] and coaches . . . set up the drill in such a way that much smaller, inexperienced underclassmen would be pitted against larger, stronger, more experienced upperclassmen."). Alleging that the drill was structured by "the School District" without pointing to any facts that could, if proved, support the proposition that this was all a "school district policy" simply fails to meet the plausibility requirement to withstand a Motion to Dismiss.

[24] Such a conclusion still requires a deprivation of a substantive constitutional right. *Id.*; *see also Kaucher v. Cnty. of Bucks,* 455 F.3d 418, 423 n. 2 (3d Cir.2006) ("[T]he initial inquiry under the doctrine . . . of municipal liability asks whether the plaintiff asserted a violation of a cognizable constitutional right."); *Benedict v. Sw. Pennsylvania Human Servs., Inc.*, __ F. Supp. 3d __, No. 14-0678, 2015 WL 1359147, at *3 n.4 (W.D. Pa. Mar. 24, 2015) ("[N]o county may be held liable via section 1983 for an unconstitutional custom, policy, or practice, if the custom, policy, or practice at issue did not cause some deprivation of constitutional rights."). While the Court concludes the Complaint does not sufficiently plead a constitutional claim, it is appropriate to separately address the issue of municipal liability since the Court will grant leave to amend, and these claims fail for reasons beyond the Plaintiff's failure to plausibly plead the elements necessary to establish a deprivation of a constitutional right.

Instead, claims of this nature may only survive dismissal "when the 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" *Watson v. Abington Twp.*, 478 F.3d 144, 155 (3d Cir. 2007) (quoting *Monell*, 436 U.S. at 694).

Simply put, these claims may be alleged based on formal action (a policy) or informal action (a custom) on behalf of the municipality. Establishing a municipal *policy* requires a decision-maker with final authority under state law to issue "an official proclamation, policy, or edict." *Id.* at 155 (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir.1990)). A *custom* requires such a decision-maker's "knowledge of, and acquiescence to, a practice," or a course of conduct that is "so well-settled and permanent as virtually to constitute law." *Id.* at 155–56 (internal quotation marks and citations omitted). *Monell* liability does not attach under either theory unless a policy-making official with "'unreviewable discretion,'" *id.* at 156 (quoting *Andrews,* 895 F.2d at 1481), "is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom," *id.* at 156–157 (quoting *Bielevicz*, 915 F.2d at 850).[25] Plaintiffs must also establish that the School District was the "moving force behind the injury alleged." *Chambers ex rel. Chambers v. Sch. Dist. Of Philadelphia Bd Of Educ.*, 587 F.3d 176, 193 (3d Cir. 2009) (internal quotation marks and citation omitted).

Mr. Dorley does not plausibly allege in the Complaint that any final policy-making official issued any type of official proclamation, policy, or edict whereby the School District formally endorsed the structuring of a drill in an allegedly unconstitutional manner.[26] In reality, his

---

[25] Moreover, plaintiffs must prove that the alleged policy or custom proximately caused their injuries, meaning they must show "the specific violation was made reasonably probable by permitted continuation of the custom." *Id.* at 156 (internal quotation marks and citation omitted).

[26] As a general matter, under the Constitution and By-laws of the Pennsylvania Interscholastic Athletic Association ("PIAA"), it is the high school principal who is charged with direction of interscholastic athletics. *See* 2015-2016

allegations against the School District are form-book boilerplate, sounding in *respondeat superior*, and he never identifies who made the policy he so generically pleads. He has similarly not plausibly pled any facts to support the conclusion that School District's final policy-makers acquiesced in the coaches' structuring of a drill that pitted "smaller, weaker and younger underclassmen" against "much larger, stronger and older upperclassmen during 'contact' drills, when none of the players were outfitted with proper protective equipment, and when the upperclassmen had previously demonstrated excessive aggression and violence in such drills against underclassmen." *See Patrick*, 296 F. App'x at 262 ("Plaintiffs offer no evidence that Great Valley officials imbued with final policymaking authority knew of, or had any reason to know of, Coach Brown's alleged practice of matching lighter wrestlers with much heavier teammates during practice.").

Without plausibly pled facts supporting the inference that either one or more of the football coach Defendants was factually and legally the final decision-maker possessing unreviewable authority in that regard, or that the final policy-makers within the School District directed, or specifically knew of and acquiesced to the challenged conduct, the Complaint cannot state a claim for municipal liability as to the School District itself.[27] But, because the Court cannot rule out the

---

PIAA Const. art. X, § 1 ("The Principal of each school, in all matters pertaining to the interscholastic athletic relations of the Principal's school, is responsible to the PIAA . . . .").

[27] Such an assertion requires something more than some statement such as "the School District knew of this structuring of the drill" to be plausible. *See McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009) ("Fed. R. Civ. P. 8(a)(2) requires a showing, rather than a blanket assertion, of entitlement to relief that rises above the speculative level." (internal quotation marks omitted)) (reasoning that because directives issued to protestors came from individual police officers "without reference to any formal administrative or policy channels," a municipal liability claim for First Amendment violations was properly dismissed); *Phillips*, 515 F.3d at 231–32 ("[T]he 'plain statement' [must] possess enough heft to 'sho[w] that the pleader is entitled to relief.'") (quoting *Twombly*, 127 S.Ct. at 1966).

What is missing here are plausible facts that would allow the Court to conclude (1) which final decision-makers knew of and directed, or knew of and acquiesced in, the specific manner in which this drill was conducted whereby small underclassman were pitted against larger upperclassman who were encouraged to "exhibit their dominance," ECF No. 1-1, at ¶ 19; or (2) which final decision-makers directed, knew of and acquiesced in, the general "atmosphere that

possibility that these defects could be cured by an Amendment, the claims against the School District will be dismissed without prejudice, but with leave to amend.

### C. Tort Claims Against Mr. McElhinny, the Student Defendant

Because the Court will dismiss the federal counts but grant leave to amend, it will also address Mr. Dorley's state law claims. In Counts VIII–X of his Complaint, Plaintiff asserts claims against Mr. McElhinny, the Student Defendant, for battery, intentional infliction of emotional distress ("IIED"), and negligence. The Court will dismiss the IIED count with prejudice but will deny the Motion to Dismiss with regard to the counts for battery and negligence.

As to the battery claim of Count VIII, the tort of battery requires "a harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff or a third person to suffer such a contact, or apprehension that such a contact is imminent." *Herr v. Booten*, 580 A.2d 1115, 1117 (Pa. Super. Ct. 1990) (internal quotation marks omitted). For a battery to occur, the offensive contact must not be consented to by a plaintiff—the presence of consent negates the wrongfulness element and prevents a battery from taking place. *Levenson v. Souser*, 557 A.2d 1081, 1088 & n.3 (Pa. Super. Ct. 1989); *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 147 (3d Cir. 1998) ("Plaintiffs must prove as a constituent element they did not consent to the tortious conduct."); *see also* Restatement (Second) of Torts § 892A(1) (1979) ("One who effectively consents to conduct of another intended to invade his interests cannot recover in an action of tort

---

encouraged violence," *id.*; or (3) how the specific structure of the drill came to the attention of a final decision-maker; or (4) who exactly was/were the final decision-maker(s).

It also does not appear from the face of the Complaint that the football coaches possessed delegated authority to act with finality and that those actions were then ratified by final decision-makers in the School District. *See Kelly v. Borough of Carlisle*, 622 F.3d 248, 264 (3d Cir. 2010) ("[R]atification occurs only 'when a subordinate's decision is subject to review by the municipality's authorized policymakers because they have retained the authority to measure the official's conduct for conformance with their policies.' 'Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy.'" (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 130 (1988) (plurality opinion)) (internal alteration and citation omitted)).

All in, Plaintiff's amorphous assertions that "the School District knew" simply don't cut it in this context.

for the conduct or for harm resulting from it.").[28]  Determining "whether the particular conduct is within the scope of the consent given" is often a "question of degree," and only "a much greater force would clearly exceed" the scope of consent while "[m]inor differences in degree or extent" do not.  *Id.* at cmt. on Subsection (2)(c).  For example, "consent to a fight with fists is not consent to an act of a very different character, such as biting off a finger, stabbing with a knife, or using brass knuckles."  *Id.*

There is no question that some degree of consent was present in this case, as Mr. Dorley voluntarily participated in a football training camp and "had played football every season since he was in first grade."  ECF No. 1-1, at ¶38(e); *see also* ECF No. 6, at 6–7.  What is less evident is whether the Student Defendant's alleged conduct was within the scope of that consent, or whether it is more analogous to "act[s] of a very different character," such as using brass knuckles in a fistfight.  Restatement (Second) of Torts § 892A cmt. on Subsection (2)(c) (1979).  Mr. Dorley argues that his consent "was limited to the prescription for the drill," and that drill was meant to be completed at less than full speed, wherein the blocker would push the player holding the blocking pad back ten (10) yards.  ECF No. 11, at 7.  Plaintiff contends that the Student Defendant instead drove him back "15-16 yards, and then [gave] him a violent shove in the air at the end."  Mr. Dorley contends that these facts clearly show that the Student Defendant exceeded the scope of Mr. Dorley's consent.  If that is not enough, Plaintiff further argues, his consent was terminated when he yelled at the Student Defendant to stop during the course of the drill and Mr. McElhinny did not comply.  *Id.* ("Thus, any consent [the Student Defendant] had during the drill was terminated before the final shove resulting in plaintiff's injuries.").

---

[28] The Court notes that the Supreme Court of Pennsylvania does not appear to have adopted this section of the Restatement, but that both a majority, and a concurring and dissenting opinion of that Court cited it without disagreement in a fairly recent case.  *See C.C.H. v. Philadelphia Phillies, Inc.*, 940 A.2d 336, 348 n.18 (Pa. 2008) ("[T]he citation to the Restatement supports our position."); *id.* at 350 (Castille, J., concurring and dissenting).

The Court concludes that drawing all reasonable inferences in Mr. Dorley's favor, the Complaint states a cause of action for battery against Mr. McElhinny. Although continuing the drill after the specific stop point and driving Plaintiff a few yards farther back than called for might only marginally exceed the scope of the drill, the specific allegations that the Student Defendant ended the drill with a "final, violent shove" after Mr. Dorley yelled for Mr. McElhinny to stop, do not permit the Court to conclude as a matter of law that discovery will not "reveal evidence of the necessary element[s]" of battery, as would be required at the Motion to Dismiss stage. *Thompson,* 748 F.3d at 147; *see also Sciotto*, 81 F. Supp. 2d at 577 (denying summary judgment on battery claims and concluding that genuine issues of material fact existed regarding intent when the defendant was a high school wrestling alumnus who live-wrestled a much smaller high school student during a practice when the smaller student suffered permanent paralysis).

Next up is the negligence claim of Count X. "There are four elements to a cause of action for negligence: a duty of care, a breach of that duty, a causal connection between the defendant's conduct and the resulting injury, and damages." *Zeidman v. Fisher*, 980 A.2d 637, 639 (Pa. Super. Ct. 2009).

Mr. McElhinny argues that Mr. Dorley fails to state a claim of negligence against him because no duty of care existed: "appellate court cases have held that a participant assumes the reasonable risks inherent in the sporting event, discharging fellow participants [sic] duty of care." ECF No. 6, at 9; *see Johnson by Johnson v. Walker*, 545 A.2d 947 (Pa. Super. Ct. 1988); *Bowser v. Hershey Baseball Assoc.*, 516 A.2d 61 (Pa. Super. Ct. 1986). The Court has also found other cases recognizing and discussing this general "no-duty" rule in the sports context. *See, e.g., Jones v. Three Rivers Management Corp.*, 394 A.2d 546 (Pa. 1978); *Craig v. Amateur Softball Ass'n of Am.*, 951 A.2d 372, 375–76 (Pa. Super. Ct. 2008); *Oliver v. Chartiers-Houston Athletic Ass'n*, 28

Pa. D. & C.4th 484, 489 (Com. Pl. 1995). Mr. McElhinny contends that football drills "are an essential part of the sport of football," and that thus the Student Defendant "was relieved of his responsibility, or duty of care, to Plaintiff during the football drill in which he was injured." ECF No. 6, at 10. Plaintiff, in response, criticizes the case law cited by the Student Defendant (without attempting to provide any of his own). Mr. Dorley's primary point is that "[j]ust because plaintiff and defendant were engaged in a football drill (albeit, non-contact), in which there [are] *some* inherent risks, does not mean that defendant could act as violent or aggressive as he wanted with impunity." ECF No. 11, at 10–11.

"Whether a duty exists is a question of law for the trial court to decide." *Brisbine v. Outside In Sch. of Experiential Educ., Inc.*, 799 A.2d 89, 95 (Pa. Super. Ct. 2002).[29] If an injury is a "'common, frequent and expected'" part of the activity, no duty is owed. *Zeidman*, 980 A.2d at 643 (quoting *Jones,* 394 A.2d at 551–552). In *Zeidman v. Fisher*, the court reversed a grant of summary judgment on the basis that no duty applied when a golfer was struck by another member of his party's ball after agreeing to scout ahead to see whether another group was out of harm's way. *Id.* at 638–39. The court addressed both the assumption of risk doctrine and the "no duty" rule to conclude that while a golfer's participation in golf generally constitutes an "acceptance of risk inherent in the activity such that another golfer, or the golf course owner, may be relieved of a duty of care," the circumstances of the accident raised questions as to whether the "risk of injury was one inherent or 'common, frequent and expected' in the game." *Id.* at 643; *see also Crews v. Seven Springs Mountain Resort*, 874 A.2d 100, 102 (Pa. Super. Ct. 2005) (holding that while some risks are inherent to the sport of skiing, the risk of a collision with an underage, intoxicated snowboarder was not among those foreseeable risks).

---

[29] "While the existence of a duty is a question of law, whether there has been a neglect of such duty is generally for the jury." *Charlie v. Erie Ins. Exch.*, 100 A.3d 244, 250 (Pa. Super. Ct. 2014) (quoting *Emerich v. Phila. Ctr. for Human Dev., Inc.,* 720 A.2d 1032, 1044 (Pa. 1998)).

Also relevant here is the standard that would define a breach of a duty between participants of a contact sport.  In *Archibald v. Kemble*, 971 A.2d 513 (Pa. Super. Ct. 2009), the Superior Court of Pennsylvania held "that a hockey player must have engaged in reckless conduct to be subject to liability for injuries received by another player in a no-check league," *id.* at 517.  This meant that the traditional negligence standard was inappropriate there.[30]  As the court explained in *Archibald*, when participants in a no-check hockey league "know or should know the rules and understand the rules serve to protect the participants, then each player has a duty to the next to comply with those rules," and "reckless disregard for the safety of other players cannot be excused."  *Id.* at 518.[31]  The court instructed that the following factors should be considered to determine whether a player's conduct was sufficiently reckless to support a claim:

> The specific game involved, the ages and physical attributes of the participants, their respective skills at the game and their knowledge of its rules and customs, their status as amateurs or professionals, the type of risks which inhere in the game and those which are outside the realm of reasonable anticipation, the presence or absence of protective uniforms or equipment, the degree of zest with which the game is being played, and doubtless others.

*Id.* at 520 (internal citations omitted).

The Court agrees with Mr. McElhinny that there is no duty of care on the part of other sports' competitors when injuries result from activities that are "merely part of the game."  ECF No. 6, at 11.  However, the next question—whether the facts alleged in the Complaint constitute

---

[30] The higher standard is justified partially because "[v]igorous participation in athletic competition is a public policy to be encouraged," and because allowing suits to proceed on mere negligence theories "could lead to an overabundance of litigation."  *Id.* at 518.

[31] Other cases from various jurisdictions which analyze the standard of care owed to other participants in sports, which also vary in terms of factual similarity to this case, include *Cruz v. Gloss*, 57 Pa. D. & C.4th 449 (Com. Pl. 2002) *aff'd*, 889 A.2d 121 (Pa. Super. Ct. 2005) (collision between skier and snowboarder), *Hackbart v. Cincinnati Bengals, Inc.*, 601 F.2d 516 (10th Cir. 1979), *receded from on other grounds by Perrin v. Anderson*, 784 F.2d 1040 (10th Cir. 1986) (intentional conduct during professional football game); *Kabella v. Bouschelle*, 672 P.2d 290 (N.M. 2003) (informal football game among minors when injury alleged resulted from negligent disregard of rule that plaintiff was "down"), *Karas v. Strevell*, 884 N.E.2d 122 (Ill. 2008) (minor playing in organized hockey game alleged body check from behind by two opposing players).

behavior that is "merely part of the game"—is really a question of framing: while it is true that drills are part of the sport of football, drills are only "part of the game" *when performed in an anticipated manner reasonably inherent to the game.* Consenting to play football as a general matter involves tackling, blocking, pushing, and shoving—but it does not involve, as alleged here, an unnecessary effort either designed to seriously injure the Plaintiff, or conduct that would likely and foreseeably lead to that result. Recklessly breaking the rules that a participant knows are the rules may also open a contact sports participant up to liability. See *Archibald*, 971 A.2d at 520–21 (reversing a grant of summary judgment for the defendant, holding that evidence existed to allow the claim to proceed to a jury). Here, for instance, if as pled the Student Defendant knew or should have known that the drill was to be performed as a non-contact drill at half speed, and discovery shows that he recklessly disregarded that rule, he could be liable under the *Archibald* standard.

The Court cannot say as a matter of law that the negligence claim cannot proceed. In a strikingly similar factual situation from several decades ago, the Pennsylvania Supreme Court reversed a grant of a compulsory nonsuit in a case where the plaintiff, a high school football player, was injured during pre-season football training conducted without the use of protective equipment. *Rutter v. Northeastern Beaver County School Dist.*, 437 A.2d 1198, 1200 (Pa. 1981) (plurality opinion). The plaintiff there was struck in the eye by a teammate (one of the defendants) on the opposing side during a game of "jungle football," a drill conducted without pads that nonetheless consisted of tackling and body blocks. *Id.* at 1201. In addition to purportedly abolishing the assumption of risk doctrine (except in certain narrow circumstances),[32] *id.* at 1209, the Pennsylvania Supreme Court drew all reasonable inferences in the plaintiff's favor (as the Court must do here), and held that "the trial court's determination that there was no question of

---

[32] It is not certain that the assumption of risk doctrine was actually abolished through that opinion, as the Third Circuit recognized in *Vargus v. Pitman Mfg. Co.*, 675 F.2d 73, 75 (3d Cir. 1982). Whether the issue is framed as assumption of risk or lack of duty, however, makes no material difference in this case.

negligence for the jury was patent error." *Id.* at 1202. While the court's reasoning largely focused on the claims against the coaches, its reasoning did not obviate the potential propriety of a suit brought against the student defendant in the same circumstances.

The disposition in *Rutter*, as well as the analyses used in *Zeidman* and *Archibald*, lead the Court to conclude that dismissal of Mr. Dorley's negligence claim at this stage would be improvident. The facts pled in the Complaint do permit the plausible inference that Mr. McElhinny's conduct went far beyond the risks inherent in a high school football practice, and that his conduct amounted to more than simple negligence. Therefore, his Motion to Dismiss Count X will be denied without prejudice to its reassertion at a later stage.[33]

With regard to the IIED claim at Count IX, the Third Circuit, applying Pennsylvania law, has explained:

> While the Pennsylvania Supreme Court has yet to formally recognize a cause of action for intentional infliction of emotional distress, *see Taylor v. Albert Einstein Med. Ctr.*, 562 Pa. 176, 754 A.2d 650, 652 (2000), the Pennsylvania Superior Court has recognized the cause of action and has held that, "in order for a plaintiff to prevail on such a claim, he or she must, at the least, demonstrate intentional outrageous or extreme conduct by the defendant, which causes severe emotional distress to the plaintiff." *Swisher v. Pitz,* 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005 ) (discussing how the Pennsylvania Supreme Court has indicated that, were it to recognize a cause of action for intentional infliction of emotional distress, these would be the requirements necessary for a plaintiff to prevail on such a claim). In addition, "a plaintiff must suffer some type of resulting physical harm due to the defendant's outrageous conduct." *Id.* Liability on an intentional infliction of emotional distress claim "has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Field v. Phila. Elec. Co.*, [565 A.2d 1170, 1184 (Pa. Super. Ct.] 1989).

---

[33] The Court also concludes that addressing Mr. McElhinny's argument that he could be immune under the Political Subdivision Tort Claims Act, 42 Pa.C.S.A. § 8541, *et seq.*, is premature at this juncture. *See Sciotto*, 81 F. Supp. 2d at 578 (concluding that analysis of who is an "employee" for purposes of statutory immunity "is a highly fact-specific inquiry" and declining to grant summary judgment on the issue) (describing the case of *Wilson v. Miladin,* 553 A.2d 535, 537 (Pa. Cmwlth. 1989), in which "the court held that a high school football player was an employee under the Act and entitled to immunity []from a suit stemming from contact with a spectator at a football game.").

*Reedy v. Evanson,* 615 F.3d 197, 231–32 (3d Cir.2010). Sufficiently egregious conduct, as characterized by the Pennsylvania Supreme Court, includes (a) a defendant hitting a plaintiff's son with a car and killing him, then burying his body in a field where the body was not discovered for two months, (b) a defendant framing a plaintiff for homicide by fabricating records, and (c) a defendant reporting to the press that a plaintiff suffered from a fatal disease when the defendant, a team physician, knew the information was false. *Kasper v. Cnty. of Bucks,* 514 F. App'x 210, 217 (3d Cir.2013) (citing *Hoy v. Angelone,* 720 A.2d 745, 754 (Pa. 1998) (internal citations omitted)).

The Court does not believe that the facts asserted in the Complaint rise to the level of behavior needed to establish a claim for IIED. The Complaint states that Mr. McElhinny "continued driving plaintiff backwards [during the drill], even after plaintiff yelled for him to stop," and ultimately drove him back five to six yards beyond the prescribed distance for the drill, after which point he "gave plaintiff one final violent shove, throwing plaintiff into the air and causing him to flip over." ECF No. 1-1, at ¶ 23. The Complaint also asserts that when Mr. Dorley was in the training room receiving medical attention for his injuries, "some upperclassmen, including [the Student Defendant] walked past the room and mocked plaintiff for his reaction on the field after finding out he had broken his arm." *Id.* at ¶ 26.

Taking these facts as true and drawing all inferences in Mr. Dorley's favor, the Court concludes that these facts are not comparable to those that Pennsylvania courts have found sufficient to allege an IIED claim. One football player mocking another player after injuring him (while reprehensible and juvenile) is not "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.'" *Reedy*, 615 F.3d at 231–32 (quoting *Field*, 565 A.2d at 1184). This tort simply does not generally extend to conduct which results in an injury during high school sports on the basis that the student who inflicted the injury is belligerent about

it afterward. Based on the facts as pled, recognizing the IIED tort here would necessarily compel its application in the case of every battery, but Pennsylvania law requires much more. Because Mr. Dorley fails to state a claim in this regard, Count IX will be dismissed.

Defendants also seek to strike Mr. Dorley's claim that the Student Defendant's conduct could warrant an award of punitive damages. "Assessment of punitive damages [is] proper when a person's actions are of such an outrageous nature as to demonstrate intentional, willful, wanton or reckless conduct, and are awarded to punish that person for such conduct." *SHV Coal, Inc. v. Cont'l Grain Co.*, 587 A.2d 702, 704 (Pa. 1991) (internal citations omitted). Having concluded that the Complaint sufficiently alleges a claim for battery, the Court believes it is too soon to say, as a matter of law, that discovery will or will not show that the Student Defendant's actions were "willful, wanton or reckless." The Court will therefore deny the Motion to Dismiss as to claims for punitive damages against Mr. McElhinny without prejudice to its reassertion on a more fully developed factual record.

### D. Claim for Negligence and Vicarious Liability Against the Parent Defendants

Generally speaking, there is no duty to control the conduct of a third party to protect another from harm. *Brisbine v. Outside In School of Experiential Education, Inc.*, 799 A.2d 89, 93 (Pa. Super. Ct. 2002). However, an exception to this rule arises when a defendant has a "special relationship" with the person whose conduct is to be controlled. *Id.* The special relationships recognized under Pennsylvania law are those listed in Sections 316–319 of the Restatement (Second) of Torts, *id.*, and include the special relationship of a parent and child, Restatement (Second) of Torts § 316.[34] According to the Pennsylvania Supreme Court, "a parent/child

---

[34] It is worth noting that while the Pennsylvania Supreme Court may not have explicitly adopted these sections of the Restatement, *see K.H. v. J.R.*, 826 A.2d 863, 876 (Pa. 2003) (Newman, J., concurring) ("While the majority appears reluctant to adopt Restatement (Second) of Torts § 316, I have no such reservation."), the *K.H.* majority stated that § 316's "requirements are consistent with those expressed in the Court's jurisprudence," *id.* at 873 n.14.

relationship by itself is insufficient to render the parents liable for the tortious acts of their children, [but] liability may attach where the negligence of the parents makes the injury possible." *K.H. v. J.R.*, 826 A.2d 863, 873 (Pa. 2003). A parent may therefore be liable for the tortious conduct of a minor child when the parent "(a) knows or has reason to know that he has the ability to control his child, and (b) knows or should know of the necessity and opportunity for exercising such control." Restatement (Second) of Torts § 316.

Mr. Dorley alleges that the Student Defendant was, at the relevant time, in the eleventh grade and a minor. *See* ECF No. 1-1, at ¶¶ 12; 118. He further alleges that the Parent Defendants "owed a duty to exercise reasonable care so as to control their (then) minor child as to prevent him from intentionally harming others or from conducting himself as to create an unreasonable risk of bodily harm to plaintiff, because they knew or had reason to know of their ability to control their child, and knew or should have known of the necessity and opportunity for exercising such control." *Id.* at ¶ 118. More specifically, Mr. Dorley contends that the Parent Defendants, *inter alia*, failed to teach their son to "refrain from assaulting and battering people" and should be liable for "allowing their reckless, aggressive and violent son to participate in a contact sport." *Id.* at ¶ 122(c), (f).

The Court concludes that the claim as stated is legally insufficient. There are no facts alleged that would indicate the Parent Defendants had any reason to know that their son was so "reckless, aggressive and violent" that he should not be allowed to participate in a contact sport. *Id.* at ¶ 122(a), (c). None. The vast majority of the "claim" as pled consists of blanket legal conclusions which the Court must disregard, ECF No. 1-1, at ¶¶ 117–123; *see Fowler*, 578 F.3d at 210–11 (citing *Iqbal*, 129 S. Ct. at 1949), and the Parent Defendants are mentioned nowhere else in the Complaint's entire factual recitation. There is nothing in Mr. Dorley's Complaint from

which the Court could plausibly infer that the Parent Defendants knew their son was overly aggressive in football drills and that he could not be trusted, in the context of a contact sport, to not exceed the scope of another student's consent to play the sport, or the coaches' express direction in such regards. There is no allegation that Mr. McElhinny had harmed the Plaintiff or others in the past and the parents knew about that, and certainly nothing from which to infer that the Parent Defendants knew or reasonably should have known that their child was impermissibly violent (at least in this setting). Moreover, there is nothing pled to indicate that the Parent Defendants had the "ability and opportunity to control" their child when he was under the supervision of his coaches at practice. *K.H.*, 826 A.2d at 875 (holding that shared custody of a child was insufficient to establish liability for a father who knew his son had a BB gun and allowed the son to bring the gun to his mother's house because there was otherwise no evidence showing the father's ability to control his son's behavior at the mother's house).

The Complaint (drawing all inferences in favor of the Plaintiff) is muddled as to whether the Plaintiff is alleging that the individual School District Defendants instructed Mr. McElhinny to act in a certain way or whether Mr. McElhinny purposely disregarded the Defendant coaches' instructions and violently attacked Mr. Dorley, or both. But more to the point, the purely conclusory, boilerplate allegations against the parents do nothing to tie them into the injury to the Plaintiff and would purport to make parents absolutely liable for any tort committed by a child, a theory precisely contrary to settled Pennsylvania law. The claim for negligence or vicarious liability against the Parent Defendants cannot proceed.[35]

---

[35] Given the purely conclusory nature of what is pled as to the parents, and the complete dearth of any connection between them and the detailed factual recitation of what happened at practice on the day of the injury, the Court will deny leave to amend as to them, concluding that allowing amendment of the pleading in this regard would run directly contrary to the "wait and see" rule of *Cureton*, 252 F.3d at 273–74.

## IV.    CONCLUSION

The School District Defendants' Motion to Dismiss is granted without prejudice and with leave to amend for the reasons stated in this Opinion.  The Student Defendant and Parent Defendants' Motion to Dismiss is granted in part and denied in part: it is granted to the extent that all claims against the Parent Defendants are dismissed with prejudice, as is the claim against the Student Defendant for IIED; the Motion is denied as it relates to the claims against the Student Defendant for battery, negligence, and punitive damages.  Should the Plaintiff decline to amend as to his federal claims, the dismissal of the federal claims without prejudice will convert to dismissal of them with prejudice in thirty (30) days without further Order of this Court.  Should that occur, the remaining state law claims against the Parent Defendants and Student Defendant will be remanded forthwith and without further notice to the Court of Common Pleas of Allegheny County.

An appropriate Order will issue.


s/ Mark R. Hornak
Mark R. Hornak
United States District Judge

Dated: September 4, 2015

cc:  All counsel of record