IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ZACHARY ROBERT DORLEY, )
)
Plaintiff, )
) Civil Action No. 2:15-cv-00214
v. )
) Judge Mark R. Hornak
SOUTH FAYETTE TOWNSHIP )
SCHOOL DISTRICT, *et al.*, )
)
Defendants. )

## OPINION

**Mark R. Hornak, United States District Judge**

The Court is again confronted with Motions to Dismiss the claims brought by Zachary Robert Dorley arising from severe injuries he suffered in a drill during a high school football camp in 2009. After most claims against the South Fayette Township School District, Joseph Rossi, James Sweeney, and William Yost (collectively, the "School District Defendants") were dismissed without prejudice by Order of this Court, *see* ECF No. 27,[1] Dorley amended his Complaint, ECF No. 28. The School District Defendants and Student Defendant Steven McElhinny then filed new Motions to Dismiss, ECF Nos. 31, 39, arguing, in effect, that the amendments failed to cure the original Complaint's defects. Full briefing and oral argument again followed. ECF Nos. 32, 34, 38, 40, 42, 44.

For the reasons that follow, the Court concludes that Defendants Joseph Rossi, James Sweeney, and William Yost are entitled to qualified immunity on the claims against them in their individual capacities. As such, Counts III and IV of the Amended Complaint will be dismissed

---

[1] The Court also dismissed with prejudice certain of Dorley's claims against Terri L. McElhinny and Thomas M. McElhinny (Defendant Steven McElhinny's parents) and the School District Defendants. Claims against Steven McElhinny for battery, negligence, and punitive damages were permitted to proceed. ECF No. 27.

with prejudice. The Court also concludes that the amendments fail to state a claim against the South Fayette Township School District ("SFSD"), so Counts I and II of the Amended Complaint will be dismissed with prejudice. Finally, the law of the case doctrine—and the lack of any extraordinary changed circumstances—compel this Court to stand by its prior ruling with respect to claims against Steven McElhinny. Because those claims arise only under the Court's supplemental jurisdiction, and because the anchoring federal causes of action are no more, Counts V and VI of the Amended Complaint will be remanded to the Court of Common Pleas of Allegheny County.

## I. BACKGROUND

The facts of this case were set out at length in the Court's previous Opinion. *Dorley v. S. Fayette Twp. Sch. Dist.*, 129 F. Supp. 3d 220, 224–25 (W.D. Pa. 2015) ("*Dorley I*"). As such, only the high points and additions from the Amended Complaint will be discussed here.

The gist of the Complaint remains the same—Plaintiff was an incoming ninth grader of smaller stature who was severely injured in a football drill gone awry when he was matched up against a much larger, rising senior veteran player in a blocking drill. What is new in the Amended Complaint are certain allegations about what exactly certain people knew and when they knew it.

The Amended Complaint states that Plaintiff expected the drill to be "conducted at less than full speed and in a non-contact manner." ECF No. 28, at 4 ¶ 16. That is so because the drill was "advertised" that way by the coaches. But Plaintiff now believes and therefore avers "that defendants SFSD, Rossi, Sweeney, and Yost discreetly encouraged violence and aggression by upperclassmen upon underclassmen during the drill." *Id.* ¶¶ 18–19. Plaintiff also alleges that the School District Defendants encouraged upperclassmen to turn non-contact drills into contact

2

drills, thereby morphing otherwise legitimate drills for teaching football technique into dangerous size, skill, and attitude mismatches. *Id.* at 7 ¶¶ 35–37.

Another new allegation in the Amended Complaint is that the School District Defendants were aware of the potential for injury in these sorts of situations because "younger, smaller and weaker underclassmen were injured or nearly injured by violent, aggressive, stronger and larger upperclassmen prior to the day of the drill in question." *Id.* ¶ 35. No specifics as to any such injuries or individuals are pled.

Rounding out the new allegations are those that essentially boil down to "this has been going on for a long time and somebody in authority must have known about it." Plaintiff charges that this spring football camp was run every year for many years and these drills, as conducted, were routine. *Id.* at 8 ¶ 40. Moreover, he alleges that the School District itself through still unnamed policymakers ratified these drills by allowing them to go on and implicitly giving permission to the coaches to run the camp as they did. *Id.* at 8–9 ¶¶ 41–46.

The counts in the Amended Complaint are as follows: Count I is for violation of bodily integrity under the Fourteenth Amendment's Due Process Clause against the School District; Count II is a state-created danger claim under the Fourteenth Amendment's Due Process Clause against the School District; Count III is a violation of bodily integrity claim against Rossi, Sweeney, and Yost; Count IV is a state-created danger claim against Rossi, Sweeney, and Yost; and Counts V and VI are state law tort claims against Steven McElhinny.

## II. **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of complaints that fail to state a claim upon which relief can be granted. Claims must be facially plausible in that they need to contain "factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). And while Courts "must accept as true all of the allegations contained in a complaint . . . [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Legal conclusions may provide the framework of a complaint, but they must be supported by factual allegations that "show" a right to, and basis for, relief. *Id.* at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* (internal quotation marks and alterations omitted).

### III. ANALYSIS

The Court will address first the doctrine of qualified immunity as applied to the individual School District Defendants. Next will be the claims against the School District itself. Finally, the Court will revisit the state law tort claims raised against the Student Defendant.

#### A. Qualified Immunity as to the School District Defendants

The individual School District Defendants again raise qualified immunity as a defense in their Motion to Dismiss. ECF No. 40, at 5. This Court demurred on the qualified immunity issue in the first round of motions to dismiss, deciding that the doctrine could be considered more precisely once the Complaint was amended. *See Dorley I*, 129 F. Supp. 3d at 229. Then, in its second opinion of the October 2015 Term, the United States Supreme Court reminded we inferior federal courts of the wide breadth and deep reach of qualified immunity's coverage. *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (*per curiam*) ("[p]ut simply, qualified immunity protects 'all by the plainly incompetent or those who knowingly violate the law'") (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). It is with that admonition in mind that the Court

4

now turns to the question of whether the individual School District Defendants are entitled to qualified immunity here.

"[Q]ualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix*, 136 S. Ct. at 308 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). A right is clearly established if it is "sufficiently clear that *every* reasonable official would have understood that what he is doing violates that right." *Id.* (emphasis added). And while there need not be "a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Importantly, in considering the "clearly established law" prong, the right may not be defined "at a high level of generality." *al-Kidd*, 563 U.S. at 742. Therefore, the Court's inquiry into the constitutional rights that Dorley says the School District Defendants infringed "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 136 S. Ct. at 308 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (*per curiam*)).

The individual School District Defendants argue that they are immune because the rights that Dorley alleges they violated were not clearly established at the time of the incident. ECF No. 40, at 6–8. Dorley counters "the right to freedom from school officials' deliberate indifference to, or affirmative acts that increase the danger of, serious injury from unjustified invasions of bodily integrity perpetrated by third parties in the school setting is consistent with constitutional rights identified by this Circuit and others." ECF No. 42, at 9. But to determine whether or not

5

the School District Defendants are entitled to qualified immunity, the Court must divine the *particular* constitutional right that was, or was not, clearly established.

When pressed at oral argument, Dorley's counsel gave this formulation:

> Matching up [a] 120-pound eighth grader against a 240-pound 11th grader in a drill where the eighth grader is anticipating it to be a noncontact drill and the 11th grader knows otherwise, as ingrained in a culture devised by the coaches . . . The eighth grader has a constitutional right not to be subjected to that type of atmosphere unwillingly.[2]

That definition of the right appears to be sufficiently specific for qualified immunity purposes. It is not highly-generalized, nor is it a recitation of some broad constitutional principle. Therefore, the question becomes whether that right was clearly established on or about May 28, 2009, the date of Zachary Dorley's injuries.

Dorley argues that this right was clearly established based primarily on two cases: *Patrick v. Great Valley Sch. Dist.*, 296 F. App'x 258 (3d Cir. 2008) and *Sciotto v. Marple Newtown Sch. Dist.*, 81 F. Supp. 2d 559 (E.D. Pa. 1999). In *Patrick*, junior high wrestling coaches directed two students with a weight differential of roughly 90 pounds to "live wrestle" each other during a practice. 296 F. App'x at 260. Those 90 pounds amounted to a three-weight class differential even though the Pennsylvania Interscholastic Athletic Association ("PIAA") required competition against opponents only in a wrestler's own weight class or the one above.[3] *Id.* The smaller wrestler suffered leg injuries. *Id.* The Third Circuit reversed a grant of summary judgment to the coaches, holding that a rational jury could find that the coach's conduct "shocked the conscience" and therefore the wrestler could maintain his due process claim under

---

[2] Based on a review of the Plaintiff's Amended Complaint, the Court believes that Plaintiff's counsel fully and fairly stated the contours of the right he claims the School Defendants violated.

[3] The PIAA guidelines applied to interscholastic matches but not to practices. *Patrick*, 296 F. App'x at 260.

the state-created danger doctrine. *Id.* at 262.[4] Notably, the *Patrick* opinion did not address qualified immunity, nor did it specifically articulate the constitutional right at issue.

And in *Sciotto*, a student wrestler "live wrestled" against a twenty-two year old alumnus who was 35-40 pounds heavier (and who was a Division I college wrestler at Pennsylvania State University). 81 F. Supp. 2d at 561–62. During the practice, the student wrestler's spine was injured and he was rendered a quadriplegic. *Id.* at 562. The court concluded that Sciotto had stated a claim for violation of bodily integrity under the Fourteenth Amendment because "by maintaining a tradition of inviting older, heavier, more experienced alumni to participate in wrestling practices, [the defendants] 'used their authority to create an opportunity'" for Sciotto to be injured that would not otherwise have existed. *Id.* at 567. Further, the court declined to grant the *Sciotto* defendants qualified immunity because the constitutional right of students to be free "from school officials' deliberate indifference to, or affirmative acts that increase the danger of, serious injury from unjustified invasions of bodily integrity perpetrated by third parties in the school setting" was clearly established. *Id.* at 568.[5]

Dorley's argument that his articulated constitutional right was clearly established in 2009, however, runs head-long into the Third Circuit's opinion in *Spady v. Bethlehem Area School District*, 800 F.3d 633 (3d Cir. 2015), *cert. denied sub nom. Spady v. Rodgers*, 136 S. Ct. 1162 (2016). There, the Circuit dealt with a section 1983 suit arising out of a student's death by "dry drowning" after a mandatory swim class run by his physical education teacher. *Spady*, 800 F.3d

---

[4] Importantly, the Circuit did not decide that the coach's conduct indeed "shocked the conscience," only that a rational jury could conclude as much.

[5] This Court is not sold that *Sciotto*'s definition of the constitutionally-protected right would now make the grade, especially in light of the Supreme Court's most recent pronouncement on qualified immunity in *Mullenix*. Certainly schools have protective obligations under the state-created danger doctrine, but binding case law has subsequently cast doubt that those obligations do, or can be defined to, extend to all invasions of bodily integrity perpetrated by third parties as described by the *Sciotto* formulation.

7

at 635. In granting qualified immunity coverage to the physical education teacher, our Court of Appeals defined the constitutional right quite narrowly: there was no clearly established right to dry-drowning-intervention protocols while participating in physical education class. *Id.* at 641. Importantly for the purposes of this case, our Court of Appeals noted that "when faced with factual scenarios analogous to *Sciotto* [a case upon which the *Spady* plaintiff principally relied]—i.e., injuries sustained during school athletic activities—several district courts in this circuit have reached decidedly different conclusions and declined to find a constitutional violation." *Id.* at 640 n.7. Those diverse decisions, the *Spady* Court said, "demonstrate there is no vigorous consensus of authority to support *Sciotto*'s broad holding."[6] *Id.* And at the very least, for the purposes of this case, this observation by the *Spady* Court demonstrates that the right Dorley seeks to vindicate was not "beyond debate" in 2009. *See al-Kidd*, 563 U.S. at 741.

Even accepting all of the allegations in the Amended Complaint as true, as the Court must, in applying the directives of *Mullenix* and *Spady*, this Court cannot conclude that *Patrick* and *Sciotto* put every high school football coach on notice in 2009 that they would be violating the Constitution if they designed a non-contact football drill that was actually full-contact where

---

[6] Those cases failing to find constitutionally-protected rights include one involving a previously-concussed cheerleader who was struck in the head by another cheerleader during practice, *Lavella v. Stockhausen*, No. 13-cv-0127, 2013 WL 1838387 (W.D. Pa. May 1, 2013), one involving a student who was impaled by a javelin thrown by another student, *Leonard v. Owen J. Roberts Sch. Dist.*, No. CIV.A. 08-2016, 2009 WL 603160 (E.D. Pa. Mar. 5, 2009), and one involving returning a concussed student to a basketball game, *Yatsko v. Berezwick*, No. 3:06-cv-2480, 2008 WL 2444506 (M.D. Pa. June 13, 2008).

The Third Circuit also noted several cases from around the country finding such a right. They include one in which the coach struck a student with a blunt object, knocking out his left eye, *Neal ex rel. Neal v. Fulton Cty. Bd. of Educ.*, 229 F.3d 1069 (11th Cir. 2000) and one in which a gym teacher picked up a student by his throat and rammed his head into bleachers and a fuse box, *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246 (2d Cir. 2001). Those cases involved patently egregious conduct that was intended to cause physical harm, which stood in contrast to typical risks associated with athletic activities. *See Spady*, 800 F.3d at 641. So in 2009, there were at least three cases (including *Sciotto*, the vitality of which the Circuit cast in doubt in *Spady*) finding a constitutionally-protected right in school athletic activities and at least three that did not. This means that at the very least, there was no "vigorous consensus" on what sorts of circumstances surrounding school-related athletic injuries give rise to a constitutional violation. *See Spady*, 800 F.3d at 640, n.7; *Hinterberger v. Iroquois Sch. Dist.*, 548 F. App'x 50, 54 & n.2 (3d Cir. 2013) (case law regarding school sports, state-created danger claims "have not been models of clarity).

bigger students were matched against smaller students. Unlike the wrestling cases *Sciotto* and *Patrick*, here there were no objective guidelines within the sport that would have necessarily tipped coaches off that they had (and when they had) created an unconstitutional risk of injury. To be sure, it is possible for high school football coaches to be liable for constitutional violations under a state-created danger theory, but football necessarily involves some size and strength mismatches and that fact alone would not create such liability. And while a culture in which bigger students are encouraged, directly or indirectly, to "test" or "toughen up" smaller students by gratuitously tossing them around the field of play rests in large part on woefully outdated thinking, and would be reprehensible by any measure, in light of *Spady*, the Court cannot say that the unconstitutionality of such conduct emanating from that culture was in 2009 "beyond debate."

The *Spady* Court expressed its concern for students who are injured in organized physical activities at school, but nonetheless applied qualified immunity in a death by dry drowning context. Indeed, there is no question here that Zachary Dorley suffered severe injuries during the drill and if the coaches acted with the motives and knowledge as now pled, such conduct is beyond the pale. At this point in the process, the allegations in the Amended Complaint are just that—allegations. But if backed up by admissible evidence at trial, a rational jury could find the elements of a state-created danger constitutional violation fulfilled in that: (1) the harm to Zachary Dorley, perhaps while not specifically intended, was "foreseeable and fairly direct," (2) that such covert scheming by adults "shocked the conscience," (3) that there was a pre-existing relationship between the coaches and players that would make smaller players "foreseeable" victims, and (4) that the adult coaches would have affirmatively used their authority to create a

9

risk of the harm pled. *See Spady*, 800 F.3d at 638 (quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1208 (3d Cir. 1996)).[7]

But concluding that what has now been pled would be a constitutional violation if proven does not resolve the matter. *Spady*, 800 F.3d at 637 n.4. Because this Court is also duty-bound to apply the qualified immunity doctrine as it is now announced by the Supreme Court, the key issue here is not only whether this conduct would violate Dorley's rights, but then whether as of the date of this episode, it was "beyond debate" that this conduct was unconstitutional. And as applied to federal litigation in the trial courts, the Supreme Court seems to have made it quite clear that the qualified immunity doctrine gives would-be constitutional tortfeasors a very wide berth, except in the refined circumstances in which a narrowly-crafted, precisely-defined, fact-specific right was so clearly recognized when the conduct occurred that every similarly-situated public official would have known that they were duty-bound to observe it.[8]

In this regard, the Court believes that *Spady* is a game changer in the school activities/state-created danger context. As the *Spady* Court observed, colorable constitutional

---

[7] The Supreme Court has said that courts are free "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236; *cf. Camreta v. Greene*, 563 U.S. 692, 707 (2011) ("In general, courts should think hard, and then think hard again, before turning small cases into large ones. But it remains true that following the two-step sequence . . . is sometimes beneficial to clarify the legal standards governing public officials.") (Kagan, J.). This Court *has* thought hard about this case in the 16 months it has been on the docket (and through two rounds of extensive motions practice) and concludes that completing both steps of the qualified immunity inquiry is both beneficial and in the interests of justice.

[8] Take *Mullenix* itself. There, a Texas Department of Public Safety officer fired his service rifle from a highway overpass at and into a car below traveling 85 miles per hour. *Mullenix*, 136 S. Ct. at 307. The officer had no training in such a tactic, had not attempted it before, and proceeded without explicit authorization from his superiors. *Id.* In fact, before the shooting Officer Mullenix had been counseled that he was not enterprising enough, and he confronted his superior afterward by saying "How's that for proactive?" *Id.* at 316 (Sotomayor, J., dissenting). The shots killed the driver of the car. *Id.* at 307. In summarily reversing the court of appeals, the Supreme Court granted the officer qualified immunity in the suit alleging that the officer had violated the Fourth Amendment by using excessive force. It held that the right to be free from "deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others" was too broadly defined, and in any event the existence of a constitutional rule barring officers from shooting from highway overpasses at cars traveling 85 miles per hour without training or authorization to do so was not "beyond debate." *Id.* at 308–09, 311.

violations had previously been found in cases in which an adult educator directly engaged in conduct that was both egregious *and* intentionally and purposefully focused on causing physical harm to a student. *See Spady*, 800 F.3d at 641 (citing cases in which an adult struck a student with a blunt object, knocking out an eye, and in which an adult picked up a student by the throat and rammed his head into bleachers and a fuse box). The *Spady* Court then contrasted those situations, each involving what was in reality direct physical battery, with the array of *Sciotto*-like cases, each of which (no matter the outcome) involved (as pled) grossly negligent or reckless conduct which created a real and appreciable risk of serious harm, but lacked an intent-to-injure component, and concluded that at least as of September 1, 2015 (the date *Spady* came down) the constitutional rights at issue in *Sciotto* were not so "clearly established" as to be "beyond debate." It is that rule of law that this Court is bound to apply here.

Particularly in light of *Spady*'s observations about the *Sciotto* line of cases, the Court concludes that even if Dorley had a constitutional right not to be subjected to football blocking drills against upperclassmen that were twice his size when he was suspecting the drills to be non-contact and when the coaches and the upperclassmen clandestinely knew otherwise, that right was not so clearly established in the *Mullenix/Spady* sense when this incident occurred in 2009 that it was "beyond debate." Therefore, the individual School District Defendants are entitled to qualified immunity and the claims against them[9] will be dismissed with prejudice.

## B. School District Liability

The School District itself has again moved to dismiss the claims against it, arguing that the Amended Complaint still fails to state a claim in either Count I or II. ECF No. 40, at 3. The

---

[9] The claims asserted against the individual School District Defendants (Rossi, Sweeney, and Yost) are at Counts III and IV.

11

Court agrees that the new allegations fail to meet the "plausibility" pleading requirements and so those Counts will be dismissed.

The first step in assessing the sufficiency of the Amended Complaint is to "take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (citing *Iqbal*, 556 U.S. at 675) (internal alterations omitted). That's easy enough—the Court already recited the elements of a state-created danger claim in *Dorley I*.[10] Plaintiffs must show that:

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts . . . and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006).

Because these claims are asserted against the School District, there is an additional wrinkle. Municipal employers like the South Fayette School District generally cannot be held vicariously liable for the unconstitutional actions of their employees. *See Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). So in reality Dorley's claims are based on his allegations that the School District had "an adopted practice, custom or policy of deliberate indifference to plaintiff's overall health, safety and welfare." ECF No. 28, at 13.

To establish municipal liability under *Monell* then, Dorley must plausibly plead that a policymaking official with unreviewable discretion "is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom" that is the "moving force

---

[10] Also, like in *Dorley I*, the Court will analyze the claims alleging harm to bodily integrity via the state-created danger theory. There remains no analytical distinction between them because the state-created danger doctrine is a vehicle with which plaintiffs can assert claims for harm to their bodily integrity. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008); *Benett ex rel. Irvine v. City of Phila.*, 499 F.3d 281, 286 (3d Cir. 2007).

12

behind the injury alleged." *Watson v. Abington Twp.*, 478 F.3d 144, 155–57 (3d Cir. 2007); *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 193 (3d Cir. 2009).

With that legal framework in mind, the Court turns to step two in this process: identifying allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Connelly*, 809 F.3d at 787 (quoting *Iqbal*, 556 U.S. at 679). Importantly, plaintiffs are required to make a "showing" that they are entitled to relief. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). Instead of blanket assertions that a party is entitled to relief, a complaint must present a set of facts consistent with the allegations it makes and those facts must be suggestive of the proscribed conduct. *Id.* at 231–32 (citing *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 563 (2007)). "[W]ithout some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests." *Id.* at 232.

The new allegations in the Amended Complaint are largely conclusory statements lacking in any factual support. Dorley now alleges that "the School District" had "advance knowledge that the drill as implemented would be dangerous to the unsuspecting, smaller, weaker underclassmen such as plaintiff, yet consciously disregarded the known risk to plaintiff by allowing and discreetly promoting the drill to be conducted in a dangerous manner." ECF No. 28, at 4 ¶ 21. He also alleges that "smaller and weaker underclassmen were injured or nearly injured by violent, aggressive, stronger and larger upperclassmen prior to the day of the drill in question" and that "the School District" was aware of the potential for injury. *Id.* at 7 ¶ 35. Most pertinent for municipal liability purposes, Dorley says that the School District's (still unnamed and undescribed) policymakers "ratified" the coaches' conduct by allowing them to run the

13

football practices and giving them authority to develop and implement football drills. *Id.* at 8–9 ¶¶ 40–46. Dorley also says that "policymakers of SFSD had, on occasion, observed the spring training camp where the general atmosphere encourage[s] violence, and the specific drill at issue where small underclassmen such as plaintiff were placed in harm's way." *Id.* at 9 ¶ 45.

Tested against the pleading standards described above, these new allegations remain only conclusions that Dorley is entitled to relief against the School District. For instance, Dorley claims to not know who the School District's involved policymakers are, despite at least (1) that under the constitution and by-laws of the Pennsylvania Interscholastic Athletic Association, the principal is presumed to be in charge of interscholastic athletics and (2) the identity of the South Fayette High School principal is knowable. *See id.* at 8 ¶ 41. Second, "some allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross the line between the conclusory and the factual." *Connelly*, 809 F.3d at 790 (quoting *Peñalbert-Rosa v. Fotuño-Burset*, 631 F.3d 592, 595 (1st Cir. 2011)). Dorley's generalized allegations that somebody in a position of authority in the School District must have known what was going on at some point in 2009 (and necessarily before) because it had been going on for a long time is not enough to survive even a low plausibility pleading bar. Saying that someone who was some sort of policymaker had observed some football practices on unstated occasions, where they saw the "general atmosphere" including drills where smaller students were matched against larger students, resulting in some sort of injuries at some prior time, does not "raise a reasonable expectation that discovery will reveal evidence of the necessary elements." *See Phillips*, 515 F.3d at 234. The principle of "where there is smoke, there must be fire" is simply no longer a viable federal pleading rule, if it ever was. *See Doe 1 v. Cty. of Fayette*, No. 14-196,

14

2014 WL 2708369, at *1 (W.D. Pa. June 13, 2014). Therefore, the Amended Complaint's new conclusory allegations are not entitled to any presumption of truth.

But even if the Court were to presume that these are new facts (not simply conclusions) and are true at step three, *Connelly*, 809 F.3d at 787, they do not "plausibly give rise to an entitlement to relief," *id.* In *Dorley I*, all claims against the School District were dismissed because the original Complaint did not plausibly allege that any final policymaking official "issued any type of official proclamation, policy, or edict whereby the School District formally endorsed the structuring of a drill in an allegedly unconstitutional manner." 129 F. Supp. 3d at 240–41. The original Complaint also did not plausibly plead any facts to support the contention that any final policymakers acquiesced in how the football practices were structured and executed. *Id.* The Amended Complaint suffers from the same deficiencies.

Dorley pleads no factual support for his bare assertions that "unreviewable policymakers" acquiesced to the coaches' conduct. He most certainly does not need to prove his case at this stage, but he must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. But here Dorley does not identify any specific policymaker or policymakers by name, title, or meaningful description nor does he point to any decision at all indicating that any such person(s) ratified dangerous drills, other than their allowing football practices to happen. He does not plead any "official proclamation, policy, or edict" nor does he plead that conducting the drills dangerously was "so well-settled and permanent as virtually to constitute law." *See Watson*, 478 F.3d at 155–56. Boiled down, and read in a light most favorable to the Plaintiff, what the Amended Complaint says is that football practices were conducted as he asserts for a long time and

15

somebody in authority must have known that smaller players were matched up against bigger ones, and at some point, some were injured in undefined ways.

The Amended Complaint fails to state a claim against the School District, so the question becomes whether further leave to amend should be granted. Highly relevant to this inquiry is the fact that Dorley already had one crack at amending (and had in hand the pleading roadmap pretty much set out by the Court in *Dorley I*). Those amendments failed to give vitality to his claims and when given a blueprint for what needed to be pled, and how, to state these types of claims Dorley has not done so. Presumably if Dorley knew (or had a reasonable basis to assert) such facts, he would have said so in the Amended Complaint. So while the general rule is that leave to amend should be granted (at least once), *see Phillips*, 515 F.3d at 236, the Court is constrained to conclude that further amendment here would be futile, *see McIntosh v. Crist*, No. 3:13-cv-103, 2015 WL 418982, at *15 (W.D. Pa. Feb. 2, 2015) (denying leave to amend after failure to cure defects with a previous amendment). Therefore, Counts I and II will be dismissed with prejudice.

### C. State Law Tort Claims

The only claims remaining in the case then are the state law tort claims against Steven McElhinny. The Court's previous Opinion held that these claims could proceed. *See Dorley I*, 129 F. Supp. 3d at 242–47. Defendant McElhinny has filed another Motion to Dismiss based on the Amended Complaint, but that Motion largely rehashes its previously-rejected arguments. ECF No. 31. It is a not-so-varied variation on a theme: essentially, Defendant McElhinny says this is just football. And while he may concede that his launching Zachary Dorley ten yards downfield could be cause for a penalty, he maintains that it cannot be tortious conduct by definition. His arguments remain unavailing.

The Amended Complaint reflects no real changes in the allegations against Defendant McElhinny. It appears that the only difference from *Dorley I* to now is the vehemence of McElhinny's opposition to those allegations. But that amplification does not change the Court's first analysis—the Amended Complaint sufficiently states claims for both battery and negligence. *See Dorley I*, 129 F. Supp. 3d at 242.

Though not so styled, Defendant McElhinny's second Motion to Dismiss could fairly be construed as a motion for reconsideration because it really just asks the Court to change its prior ruling. But applying the standard for motions for reconsideration reveals that there is no basis for changing anything. Defendant McElhinny has not shown an intervening change in the controlling law, the existence of new evidence that was unavailable when the Court issued its first Order, or any clear error of law or fact resulting in some manifest injustice. *See Peerless Ins. Co. v. Pa. Cyber Charter Sch.*, 19 F. Supp. 3d 635, 651 (W.D. Pa. 2014) (citing *Max's Seafood Café ex rel. Lou–Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir.1999)). Further, the law of the case doctrine was intended for just these sorts of circumstances. *Pub. Interest Research Grp. of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997) ("The law of the case doctrine directs courts to refrain from re-deciding issues that were resolved earlier in the litigation."). The Court has already seen this movie, and it still ends the same way.

Defendant McElhinny's second Motion to Dismiss will be denied for the same reasons the first was. Because these are the only claims remaining in the case, and because they are state law tort claims, the Court will decline to exercise supplemental jurisdiction over them and will remand them to the Court of Common Pleas of Allegheny County. *See* 28 U.S.C. § 1367(c)(3) ("district courts may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction").

## IV. **CONCLUSION**

The School District Defendant's Motion to Dismiss is granted and Counts I, II, III, and IV of the Amended Complaint are dismissed with prejudice. Steven McElhinny's Motion to Dismiss is denied. Because the only claims remaining in the case (Counts V and VI of the Amended Complaint) are state law claims, they are remanded to the Court of Common Pleas of Allegheny County, and this case is closed on the docket of this Court.

An appropriate Order will issue.

Mark R. Hornak
United States District Judge

Dated: June 1, 2016
cc:  All counsel of record